977 F.2d 1392
 61 Fair Empl.Prac.Cas. (BNA) 21, 60 Empl.
Prac. Dec. P 41,834
Lee WOODWARD, Trustee in bankruptcy, for the estate of
Janice Butler; Melinda Molina; Beverly Desomber,
Plaintiffs-Appellees,
v.
The CITY OF WORLAND, Wyoming Washakie County, Wyoming Joint
Powers Board, Defendants,
and
Ralph Seghetti, personally and in his capacity as Sheriff of
Washakie County; Allen Tolley, personally and in his
capacity as Chief of Police for the City of Worland; Andy
Williams, personally and in his capacity as an officer for
the City of Worland Police Department; R.D. Sackett,
personally and in his capacity as Undersheriff for Washakie
County; Gary Mitchell, personally and in his capacity as a
Sergeant with the Washakie County Sheriff's Department,
Defendants-Appellants.
 No. 91-8034.
 United States Court of Appeals,
Tenth Circuit.
 Oct. 19, 1992.
Rehearing Denied Dec. 15, 1992.
 
 Terry L. Armitage, Senior Asst. Atty. Gen., State of Wyo., Cheyenne, Wyo., for defendants-appellants.
 Kathryn A. Jenkins of Kline & Jenkins, Cheyenne, Wyo., for plaintiffs-appellees.
 Before EBEL, Circuit Judge, McWILLIAMS, Senior Circuit Judge,* and HUNTER, Senior District Judge.**
 EBEL, Circuit Judge.
 
 
 1
 This is an appeal from a denial of the Defendants-Appellants' motion for summary judgment on the ground of qualified immunity in a suit under 42 U.S.C. § 1983. We affirm in part and reverse in part.
 
 FACTS
 
 2
 The City of Worland, Wyoming Washakie County, Wyoming Joint Powers Board (the "JPB") is a joint communications facility for the Worland Police Department and the Washakie County Sheriff's Department. The three Plaintiffs were dispatchers for the JPB since 1985. Their job entailed dispatching police and sheriff's officers.
 
 
 3
 While at work, the Plaintiffs allege that they were subjected to sexual harassment by Defendant Williams, a police officer, and Defendant Sackett, an undersheriff (collectively, the "Officers").[1] Specifically, the Plaintiffs allege that the Officers touched them offensively and made offensive comments toward them. The Plaintiffs further allege that Defendant Tolley, the Chief of Police, and Defendant Seghetti, the Sheriff (collectively, the "Supervisors"),[2] knew about this sexual harassment and nevertheless failed to curb it. When Plaintiffs Molina and Butler formally complained about this harassment, they alleged that the Defendants[3] retaliated against them for their complaints. The allegations of each plaintiff are discussed in more detail below.
 
 A. Butler
 
 4
 Plaintiff Butler testified in her deposition that in December 1985 she was driving in a patrol car with Williams when he stopped the car and reached over to pull her toward him. Butler objected and Williams ceased his advance. She reported this incident to one of the other officers but asked him not to pass it on to the supervisors or higher authorities. Butler also testified that Williams "was just always putting his hands like on my shoulders, come up behind me and pretend he was masturbating on the back of my chair or around my neck. He would pinch me when he walked past or pat my bottom passing in the hallways." Butler Depo. at 20, in App. of Defendants/Appellants. Several other colleagues testified that they overheard Williams making explicit sexual overtures to Butler.
 
 
 5
 Butler stated that Sackett was "always coming in giving you a neck massage or trying to look down your shirt when you're sitting down." Id. at 22. Butler testified that she told Sackett this contact was unwelcome.
 
 
 6
 On March 11, 1987, Butler's attorney wrote a letter to the Worland City Attorney complaining about "physical touchings and verbal abuse" that Butler had received from Williams. However, there is no indication that any of the Supervisors were specifically made aware of Sackett's conduct. On March 20, 1987, the City Attorney wrote back requesting that Butler file a formal complaint against Williams so that the City could take action against him. That same night the City adopted a resolution that sexual harassment would constitute cause for termination. Butler did not file a formal complaint until two months later, and by that time she had resigned from the JPB. The Worland Police Commission scheduled a hearing on her complaint for June 1987. Butler, who had moved to New York, received notice of the hearing but did not appear. In the absence of a complaining witness, no final action was taken with regard to these allegations.
 
 B. Molina
 
 7
 Plaintiff Molina testified in her deposition that Williams would frequently make offensive and explicit sexual comments to her, including invitations for sex. Molina also testified that Williams "would grab her around the neck ... [w]ith a hand" and "lean up real close" to her while she was sitting. Molina Depo. at 20, in App. of Defendants/Appellants. Molina also testified that on August 22, 1989, Williams blew up at her and cursed her profanely because he thought she had misplaced a bill. She was distraught at the lack of respect indicated by this blow-up, but she did not view this incident as sexual harassment.
 
 
 8
 Molina stated that Sackett would also make sexual remarks to her and would sometimes rub her neck. It is unclear whether Molina told either Williams or Sackett that their behavior was unwelcome.
 
 
 9
 On August 24, 1989, Molina sent a letter to the City of Worland against Williams, complaining both about the August 22, 1989 blow-up and about ongoing verbal abuse and sexual harassment from Williams, and suggesting that other dispatchers may also have suffered similar abuse. There is no indication that Molina complained about Sackett's conduct toward her. In response to her complaint about Williams, a letter of reprimand dated September 1989 was placed in Williams' file and a psychological evaluation was ordered on Williams. Additionally, on December 1, 1989, the JPB put out a memorandum to "All Personnel," warning that "improper language and suggestion of a sexual nature ... will not be permitted and appropriate steps will be instituted to correct the situation should it be found to be occurring in the future." DeSomber Depo.Ex. 1, in App. of Defendants/Appellants. After Williams was reprimanded, his sexually harassing conduct toward Molina ceased.
 
 
 10
 However, Molina testified that after she issued her complaint about Williams to the City of Worland that Williams would "stare at [me] and try to intimidate [me].... When I asked him if I could help him he would say no, and then just continue to stare." Molina Depo. at 43, in App. of Defendants/Appellants. Apparently, various conversations would stop when Molina walked into the room, and occasionally various parties would engage in hushed conversations in which she would overhear only the words "sexual harassment." JPB responded further by precluding police and sheriff officers from entering the area where the dispatchers sat unless they had a need to do so. Molina took this to be a further sign of retaliation because it had the effect of reducing her contact with some of the officers who were friendly to her. In May 1990 Molina resigned. She testified that she left because of the work environment at JPB, although she also joined her husband who had obtained a job in Laramie.
 
 C. DeSomber
 
 11
 Plaintiff DeSomber testified on deposition that she also was a victim of Williams' conduct of pretending to masturbate behind her, and that she too was a recipient of his explicit sexual remarks and requests for sex. However, she states that she never complained to a supervisor about his conduct.
 
 
 12
 DeSomber testified as to Sackett that once he asked her "something about going out back or 'You want to mess around?' " Id. at 48. She responded with a strongly worded no. She also alleges that on one occasion Sackett flagged her car down, apparently when she was off duty, and asked "May I kiss you?" Id. at 50. She said no. DeSomber admitted to having dated Sackett at one point, although not at this time. DeSomber acknowledged telling sexual jokes to the officers, and once at work in response to a sexual comment she bit Mitchell on his buttock.
 
 
 13
 Although DeSomber never complained about either Williams' or Sackett's alleged sexual harassment of her, she openly supported Molina's complaint. DeSomber testified that the Defendants and their supporters retaliated against her for supporting Molina as follows: Seghetti initiated a drug investigation against all the dispatchers; once she was stopped and charged with going 53 in a 30 mile zone and was asked where she had been; she was no longer invited to attend JPB meetings; Mitchell proposed disbanding the JPB, which she felt would be disadvantageous to her; and contact between the officers and the dispatchers was restricted following Molina's complaint. In May 1990 DeSomber resigned.
 
 
 14
 The Plaintiffs asserted the following claims under 42 U.S.C. § 1983: (1) the Officers' sexual harassment and the Superiors' failure to stop it violated their right to equal protection under the Fourteenth Amendment; (2) the harassment and the retaliation that followed their reporting of the harassment (or, in DeSomber's case, her support for Molina in reporting the harassment) was so intolerable as to constitute a constructive discharge in violation of their due process rights under the Fourteenth Amendment; and (3) the retaliation they received for speaking out against the sexual harassment violated their rights under the First Amendment.
 
 
 15
 After discovery, the Defendants moved for summary judgment on the ground of qualified immunity. The district court denied the Defendants' motion and the Defendants, with the exception of the JPB,[4] filed this interlocutory appeal pursuant to Mitchell v. Forsyth, 472 U.S. 511, 530, 105 S.Ct. 2806, 2817-18, 86 L.Ed.2d 411 (1985).
 
 DISCUSSION
 
 16
 We limit our review to the question of whether the district court properly denied the Defendants' motion for qualified immunity. See Snell v. Tunnell, 920 F.2d 673, 676 (10th Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 1622, 113 L.Ed.2d 719 (1991). Under the qualified immunity doctrine, government officials "generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982) (citations omitted).
 
 
 17
 The procedure for analyzing a claim of qualified immunity is as follows. First, the defendant must raise the defense of qualified immunity. Once the defendant has adequately raised the defense, the plaintiff must show that the law was clearly established when the alleged violation occurred and come forward with facts or allegations sufficient to show that the official violated the clearly established law. Then the defendant assumes the normal summary judgment burden of establishing that no material facts that would defeat his claim for qualified immunity remain in dispute. Dixon v. Richer, 922 F.2d 1456, 1460 (10th Cir.1991); Powell v. Mikulecky, 891 F.2d 1454, 1457 (10th Cir.1989).
 
 
 18
 Under this framework, we will address each of the defendants' qualified immunity claims with respect to each of the Plaintiffs' allegations.
 
 
 19
 I. Equal Protection Claim For Sexual Harassment
 
 A. The Supervisors
 
 20
 The law was not clearly established in our Circuit until May of 1989 that sexual harassment under color of state law violates the Equal Protection Clause. Because Butler had quit by that time, all the individual Defendants, including the Supervisors, are entitled to qualified immunity with regard to the Equal Protection claim asserted by Plaintiff Butler. Additionally, we conclude that Plaintiffs Molina and DeSomber have failed to show that the Supervisors' conduct after May of 1989 violated their Equal Protection rights. Thus, the Supervisors are entitled to qualified immunity with respect to all of the Plaintiffs' Equal Protection claims.
 
 1. Butler
 
 21
 Plaintiff Butler quit in May 1987. We are aware of only one circuit and several district courts that had held prior to May 1987 that sexual harassment was actionable under the Equal Protection Clause. See Bohen v. City of East Chicago, 799 F.2d 1180, 1185-87 (7th Cir.1986), and cases cited therein. We recently held that "[o]rdinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Medina v. City and County of Denver, 960 F.2d 1493, 1498 (10th Cir.1992) (citation omitted); see also Martin A. Schwartz & John E. Kirklin, Section 1983 Litigation: Claims, Defenses, and Fees § 9.20, at 537 (2d ed. 1991) ("Normally, a single recent case from one circuit is not sufficient to make the law clearly established in another circuit. Also, a district court decision will not ordinarily ' "clearly establish" the law even of its own circuit, much less that of other circuits.' ") (footnotes and citations omitted). In Medina, we refused to conclude that the law was clearly established by a single Seventh Circuit opinion and a district court opinion from another circuit. Medina, 960 F.2d at 1498 & n. 6. Similarly, we do not believe that Bohen and the several district court cases cited therein clearly established that sexual harassment was actionable under the Equal Protection Clause in this circuit prior to May 1987. Accordingly, the district court erred in denying the Supervisors qualified immunity with respect to Butler's Equal Protection claim.
 
 
 22
 The Plaintiffs direct our attention to Andrews v. City of Philadelphia, 895 F.2d 1469 (3d Cir.1990), in which the Third Circuit held that it was clearly established by 1986 that sexual harassment by a state employer, or a state employer's conscious failure to curb such harassment, was actionable under the Equal Protection Clause. Id. at 1479. Although Andrews cites several cases on discrimination, it cites only Bohen for the proposition that it was established by 1986 that sexual harassment could amount to sex discrimination under the Equal Protection Clause. See id. at 1478, 1479. To the extent that Andrews relies on Bohen alone in finding that the law was clearly established, Medina precludes us from reaching a similar conclusion.
 
 
 23
 Alternatively, Andrews may be read as holding that because sexual discrimination was clearly actionable in 1986, it was clearly established that sexual harassment, a form of discrimination, was also actionable. On this reading as well, we respectfully disagree with Andrews. In Anderson v. Creighton, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), the Supreme Court admonished against looking at such a general right as the right to be free of sex discrimination for purposes of the "clearly established" test.The operation of [the "clearly established"] standard ... depends substantially upon the level of generality at which the relevant "legal rule" is to be identified. For example, the right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that Clause (no matter how unclear it may be that the particular action is a violation) violates a clearly established right. Much the same could be said of any other constitutional or statutory violation. But if the test of "clearly established law" were to be applied at this level of generality, it would bear no relationship to the "objective legal reasonableness" that is the touchstone of Harlow.... Such an approach, in sum, would destroy "the balance that our cases strike between the interests in vindication of citizens' constitutional rights and in public officials' effective performance of their duties," by making it impossible for officials "reasonably [to] anticipate when their conduct may give rise to liability for damages." ... It should not be surprising, therefore, that our cases establish that the right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful ... but it is to say that in light of pre-existing law the unlawfulness must be apparent.
 
 
 24
 Id. at 639-40, 107 S.Ct. at 3038-39 (citations and footnotes omitted).
 
 
 25
 Our circuit squarely joined Bohen in May of 1989 when we decided Starrett v. Wadley, 876 F.2d 808 (10th Cir.1989). In that case we unequivocally held that "sexual harassment ... can violate the Fourteenth Amendment right to equal protection of the laws." Id. at 814. However, at that time only one other circuit had explicitly joined Bohen,[5] and we therefore do not believe the law on this matter was clearly established in the Tenth Circuit until Starrett v. Wadley.
 
 2. Plaintiffs Molina and DeSomber
 
 26
 Molina and DeSomber assert Equal Protection claims against the Supervisors for sexual harassment for a time period that continued after Starrett v. Wadley was decided in May 1989 until at least September 1989.[6] However, they failed to provide any specific evidence of conduct by the Supervisors amounting to an actionable conscious failure to curb the Officers' sexual harassment after May 1989.[7]
 
 
 27
 Although Molina and DeSomber make generalized allegations of continuing sexual harassment and although they stated that the harassment was commonly known throughout the office, they were unable to respond to the Defendants' motion for summary judgment with evidence of specific acts of sexual harassment occurring after May 1989 that the Supervisors knew about and tolerated. The vague, non-time-specific, and conclusory allegations that were made against the Supervisors were not sufficient to put at issue whether the Supervisors' conduct violated clearly established rights. See Anderson, 483 U.S. at 639-40, 107 S.Ct. at 3038-39. To the contrary, when Molina finally did complain to the Supervisors about sexual harassment, the response of the Supervisors was prompt, unequivocal, and effective.[8] They put a letter in Williams' file reprimanding him, and his sexual harassment ceased. JPB followed up this action with a communication to all personnel stating that sexual harassment would not be tolerated.[9] We therefore hold that Molina and DeSomber have failed to present evidence of direct involvement by the Supervisors in the sexual harassment or of knowledge and acquiescence by the Supervisors of the sexual harassment. Thus, it was error not to grant the Supervisors' motion for summary judgment based on qualified immunity with regard to the Equal Protection claim.
 
 
 28
 Plaintiffs suggest that the Supervisors have liability under § 1983 if they merely "should have known" that sexual harassment was going on and failed to stop it, even if it was not established that the Supervisors had actual knowledge of such sexual harassment. For this proposition they cite Meade v. Grubbs, 841 F.2d 1512, 1528 (10th Cir.1988). Although Meade does use such language in the opinion, that was not the holding in Meade. The holding was that a complaint states a claim under § 1983 if it alleges that a sheriff was "deliberately indifferent" to constitutional violations by his deputies. Id. at 1528. However, if a plaintiff merely shows that a supervisor "should have known" that a subordinate was violating someone's constitutional rights and it is not established that the supervisor actually had such knowledge,[10] the plaintiff will not have established a deliberate, intentional act by the supervisor to violate constitutional rights. At most, the plaintiff will have established only that the supervisor was negligent in not observing what he should have seen. The Supreme Court has made it clear that liability under § 1983 must be predicated upon a "deliberate" deprivation of constitutional rights by the defendant. City of Canton v. Harris, 489 U.S. 378, 389, 109 S.Ct. 1197, 1205, 103 L.Ed.2d 412 (1989); Daniels v. Williams, 474 U.S. 327, 331, 106 S.Ct. 662, 665, 88 L.Ed.2d 662 (1986); Davidson v. Cannon, 474 U.S. 344, 347, 106 S.Ct. 668, 670, 88 L.Ed.2d 677 (1986). It cannot be predicated upon negligence. Daniels, 474 U.S. at 330, 106 S.Ct. at 664; Archuleta v. McShan, 897 F.2d 495, 497 (10th Cir.1990).[11]
 
 
 29
 The Supreme Court's explicit holding in 1989 in City of Canton of a scienter requirement for § 1983 liability negates any dicta that may have appeared in earlier cases suggesting that supervisor liability may be predicated upon negligence of any kind.
 
 
 30
 [S]upervisor officials may be liable under section 1983 when their failure to train subordinate employees was so severe as to constitute 'deliberate indifference'.... Earlier decisions finding that grossly negligent training may give rise to supervisory liability are no longer good law, given the specific rejection in City of Canton v. Harris of gross negligence in favor of deliberate indifference.
 
 
 31
 Schwartz & Kirklin, Section 1983 Litigation: Claims, Defenses, and Fees, § 7.11 at 386.
 
 
 32
 We are persuaded that the proper articulation of the test for supervisory liability under section 1983 is that set forth by the Third Circuit in Andrews v. City of Philadelphia, 895 F.2d 1469 (3rd Cir.1990), where it was stated that supervisor liability requires "allegations of personal direction or of actual knowledge and acquiescence." Id. at 1478. Indeed, in a case that preceded Meade, we used language that closely parallels the test set forth in Andrews. See Kite v. Kelley, 546 F.2d 334, 337 (10th Cir.1976) (holding in a Bivens action that "before a supervisor may be held for acts of an inferior, the superior ... must have participated or acquiesced in the constitutional deprivations"). See also Rizzo v. Goode, 423 U.S. 362, 371, 96 S.Ct. 598, 604, 46 L.Ed.2d 561 (1976) (supervisor liability requires an "affirmative link [between the supervisor and the subordinate] showing [the supervisor's] authorization or approval of such misconduct"); Greason v. Kemp, 891 F.2d 829, 336-37 (11th Cir.1990).
 
 B. The Officers and Mitchell
 
 33
 The Plaintiffs' Equal Protection claims against Williams and Sackett[12] for sexual harassment are more difficult because the conduct alleged against them is so offensive and unacceptable. It is possible, although we do not reach the issue on this appeal, that such conduct might give rise to liability under various state-law theories. However, the Plaintiffs have two difficulties in trying to fit this claim against the Officers into a § 1983 cause of action premised on the Equal Protection Clause of the United States Constitution.
 
 
 34
 First, as noted above, it was not clearly established law in this circuit until May 1989 that sexual harassment under color of state law was actionable under the Equal Protection Clause. See Starrett, 876 F.2d at 814. That precludes Butler's claim against Williams and Sackett, since she had resigned by then, and it significantly limits the claims of Molina and DeSomber.
 
 
 35
 Second, Williams and Sackett were not the Plaintiffs' supervisors or employers, nor did they have control or authority over Plaintiffs. Williams and Sackett remained employees of the city police and county sheriff's offices respectively, whereas the Plaintiffs were employed by the JPB, which had a separate organization and governing board. We have been cited no case clearly holding that sexual harassment on the job by one who is not in a position of authority over the victim is actionable under the Equal Protection Clause and § 1983. To the contrary, several cases have declined to find liability under § 1983 against a co-employee for harassment when the harassment did not involve use of state authority or position. Hughes v. Halifax County Sch. Bd., 855 F.2d 183, 186-87 (4th Cir.1988), cert. denied, 488 U.S. 1042, 109 S.Ct. 867, 102 L.Ed.2d 991 (1989) (refusing to constitutionalize all torts among state co-employees, and observing that Section 1983 prohibits only "the 'misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law' ") (quoting Monroe v. Pape, 365 U.S. 167, 184, 81 S.Ct. 473, 482, 5 L.Ed.2d 492 (1961)); Murphy v. Chicago Transit Auth., 638 F.Supp. 464, 467-68 (N.D.Ill.1986) (refusing to find § 1983 liability for sexual harassment among state co-workers because the sexual harassment was not related to "the powers and duties" of the defendants' jobs or to any "state authority" conferred upon the defendants); see also Dang Vang v. Vang Xiong X. Toyed, 944 F.2d 476, 479-80 (9th Cir.1991) (upholding finding that state employee, who was employed to find refugees suitable employment, used his government position to sexually harass the refugees, but otherwise citing with approval to Murphy.)Typically, liability under the Equal Protection Clause for sexual harassment in the workplace is predicated upon some authority that the wrongdoer has over the victim. Otherwise, it is difficult to establish that the abusive action was perpetrated "under color of state law" rather than as an essentially private act of sexual harassment. The mere fact that all the participants were state employees or that the offending acts occurred during working hours is not enough. See Hughes, 855 F.2d at 186. Cf. Starrett, 876 F.2d at 819-20 (holding that a county does not have liability under § 1983 when a supervisor's acts of sexual harassment against employees were unrelated to his official position or authority.) In Bohen, the Seventh Circuit noted:
 
 
 36
 Sexual harassment of female employees by a state employer constitutes sex discrimination for purposes of the equal protection clause of the fourteenth amendment. Creating abusive conditions for female employees and not for male employees is discrimination.... Forcing women and not men to work in an environment of sexual harassment is no different than forcing women to work in a dirtier or more hazardous environment than men simply because they are women. Such unjustified unequal treatment is exactly the type of behavior prohibited by the equal protection clause....
 
 
 37
 Bohen, 799 F.2d at 1185 (citations omitted) (emphasis added).
 
 
 38
 Of course, if a supervisor or employer participates in or consciously acquiesces in sexual harassment by an outside third party or by co-workers, or if the employing entity has a policy or custom of allowing such sexual harassment in the workplace, the supervisor or employer may be liable. However, here we are addressing not the liability of the supervisor or employing entity but rather the liability of a third party under § 1983 for conduct that did not rely upon or invoke state position or authority.
 
 
 39
 We do not take the occasion here to decide whether an outside third party or co-employee could ever be liable for sexual harassment under § 1983 and the Equal Protection Clause. We resolve this case simply by noting that the Officers here were not violating clearly established law under the Equal Protection Clause when they acted as they did with respect to Molina and DeSomber. Thus, it was error to deny the Officer's qualified immunity defense on this claim.
 
 II. Constructive Discharge
 A. The Supervisors
 
 40
 It has been clearly established since at least 1985 that constructive discharge from employment as to which an employee has a protectable property or liberty interest[13] may be actionable under § 1983. See Bailey v. Kirk, 777 F.2d 567, 579 (10th Cir.1985). Additionally, it has been clearly established since at least 1986 that constructive discharge exists when " 'a reasonable [person] would view the working conditions as intolerable' " and when the "working conditions [are] so difficult that a reasonable person in the employee's position would feel compelled to resign." Derr v. Gulf Oil Corp., 796 F.2d 340, 344 (10th Cir.1986) (applying constructive discharge in a Title VII case) (citation omitted); see also Irving v. Dubuque Packing Co., 689 F.2d 170, 172 (10th Cir.1982) ("[A] constructive discharge occurs when an employer deliberately makes or allows the employee's working conditions to become so intolerable that the employee has no other choice but to quit.") (emphasis added)
 
 1. Butler
 
 41
 Plaintiff Butler has not established a genuine dispute of material fact as to whether her working conditions were so intolerable that a reasonable person would have been compelled to resign. Specifically, she does not establish that she took steps short of resignation that a reasonable person would have taken to make her working conditions more tolerable. Although Butler gave deposition testimony as to facts suggesting intolerable treatment at the hands of the Officers, she did not formally complain about that treatment until she quit. Indeed, after telling a colleague about William's most direct and threatening sexual act against her, she specifically asked that colleague not to report it to management. Moreover, she continued to work at JPB and to have contact with Williams without filing a complaint for more than one and one-half years after that incident before resigning. Although cumulative events can ultimately cause working conditions to deteriorate to an intolerable level, Butler here had an alternative to resignation, and she knew it. She could have lodged a formal complaint with her supervisors against Williams and requested relief. Indeed, she ultimately took that step, but not until she had resigned. Thus, she never determined whether lodging a formal complaint was a reasonable alternative to resignation. The record suggests that the Supervisors were willing to take action against Williams promptly upon the filing of a formal complaint, and there is no indication that such action would not successfully have curbed Williams' abusive behavior.
 
 
 42
 There certainly may be situations where lodging a complaint with a supervisor would be perceived by a reasonable person to be a clearly futile act, but the Plaintiffs did not present such evidence here. Constructive discharge requires considerably more proof than establishing unpleasant working conditions. Here, Butler apparently was able to work under these circumstances for several years, and there was no showing either that the situation got substantially worse just before she quit or that requesting disciplinary action against Williams would have been ineffective. Hence, on this record, Butler failed to establish a genuine dispute as to whether a reasonable person would have believed that there was no reasonable alternative to resignation. The Supervisors therefore should have been granted qualified immunity on this claim because their conduct did not violate any clearly established law constituting constructive discharge.
 
 2. Molina and DeSomber
 
 43
 However, Plaintiffs Molina and DeSomber have established a genuine dispute of fact as to whether they were constructively discharged by the Supervisors. Granted, once the Officers' alleged sexual harassment was explicitly brought to the Supervisors' attention, the Supervisors appear to have curbed such conduct. However, there was evidence in the record that both the Officers and the Supervisors engaged in retributive conduct against Molina and DeSomber after Molina lodged her complaint about the sexual harassment. We have considerable doubt whether the retributive acts about which the Plaintiffs testified--e.g., not including them in conversations, not inviting them to meetings, laughing in conversation as they passed by, segregating the dispatchers from the police and sheriff officers, and launching a drug investigation--were so severe and intolerable that a reasonable person would have no alternative except to resign. Molina had, after all, managed to curb the sexual harassment by lodging a complaint with the City, and there appear to have been various legal avenues open to Molina and DeSomber to challenge the retributive conduct without resigning. However, these are not matters to be decided on summary judgment. There is a material dispute of fact on this record as to whether the retributive conduct either participated in by the Supervisors or knowingly acquiesced in by the Supervisors constituted constructive discharge. Thus, the district court correctly denied summary judgment to the Supervisors on their defense of qualified immunity with regard to the constructive discharge claim by Molina and DeSomber.
 
 B. The Officers and Mitchell
 
 44
 It is not clearly established even now, and therefore it certainly was not clearly established at the time of the events in this case, that someone other than a supervisor or a person with authority or responsibility for working conditions can be held liable for constructive discharge in violation of the Due Process Clause of the Fourteenth Amendment. We are not aware of any case that has so held, and the parties cite us to none. Here, of course, the Officers were not Plaintiffs' supervisors nor even were they the Plaintiffs' co-employees. They lacked any power or authority to discharge the Plaintiffs, and they had no personal constitutional obligation to provide the Plaintiffs with any kind of due process hearing in the event the Plaintiffs were discharged. The Plaintiffs have failed to make a showing sufficient to avoid summary judgment that the Officers violated a clearly established Due Process obligation owed to the Plaintiffs.[14]
 
 
 45
 Thus, we hold that the district court erred in denying summary judgment to the Officers and Mitchell[15] on the basis of qualified immunity with regard to this claim.
 
 III. First Amendment
 
 46
 A public employer may not condition employment or its incidents upon an employee's relinquishment of his or her First Amendment rights. Pickering v. Board of Educ., 391 U.S. 563, 568, 88 S.Ct. 1731, 1734-35, 20 L.Ed.2d 811 (1968); Childers v. Indep. Sch. Dist. No. 1 of Bryan County, 676 F.2d 1338, 1342 (10th Cir.1982) (altered employment conditions in retaliation for valid exercise of First Amendment rights may be an unconstitutional infringement of protected activity).
 
 
 47
 In a First Amendment action against a public employer alleging retribution for speech, the court must first determine whether the employee's speech "was on a matter of public concern." Melton v. City of Oklahoma City, 879 F.2d 706, 727 (10th Cir.1989), cert. denied, --- U.S. ----, 112 S.Ct. 296, 116 L.Ed.2d 241 (1991). If the speech involved a matter of public concern, the court must then balance "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Pickering, 391 U.S. at 568, 88 S.Ct. at 1734-35. "[T]he fact that [an] employee makes ... statements privately to the employer rather than publicly does not eliminate the Constitution's protections...." Starrett, 876 F.2d at 816-17 n. 11.
 
 
 48
 The Supreme Court has provided guidance as to what is and what is not a matter of public concern in Connick v. Myers, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). There, the Court held that speech pertaining to a governmental agency's "discharg[e] [of] its governmental responsibilities" ordinarily will be regarded as speech on a matter of public concern, while speech pertaining to internal personnel disputes and working conditions ordinarily will not be so regarded. Id. at 148, 103 S.Ct. at 1690-91. In deciding how to classify particular speech, courts focus on the motive of the speaker and attempt to determine whether the speech was calculated to redress personal grievances or whether it had a broader public purpose. Conaway v. Smith, 853 F.2d 789, 796 (10th Cir.1988). This is admittedly often a difficult line to draw, and it requires a court to consider the "content, form and context of a given statement, as revealed by the whole record." Connick, 461 U.S. at 147-48, 103 S.Ct. at 1690. Here the thrust of the Plaintiffs' speech was that they personally were being subjected to sexual harassment and they wanted it to stop. Although there were several general references in their complaints to the possibility that other women may also have been subjected to sexual harassment, no specifics were given[16] nor was the purpose or substance of the complaints to assert that the sexual harassment prevented the JPB from properly discharging its official responsibilities. A review of the entire record makes it clear that the Plaintiffs were intending to address personal grievances that they had with Williams. See Connick, 461 U.S. at 148, 103 S.Ct. at 1690-91 (a personal employment dispute is not converted into a matter of public concern merely because an employee seeks to show that other employees may have similar complaints); Gray v. Lacke, 885 F.2d 399, 410-11 (7th Cir.1989), cert. denied, 494 U.S. 1029, 110 S.Ct. 1476, 108 L.Ed.2d 613 (1990) (an employee's complaint to her supervisors about sexual harassment against her was a matter of private concern and did not state a cause of action under § 1983).
 
 
 49
 However, that is not necessarily the end of the analysis. The Supreme Court in Connick held that even speech that focuses on internal employment conditions and is made in the context of a personal dispute may be regarded as pertaining to a matter of public concern if it addresses important constitutional rights which society at large has an interest in protecting. In Connick, one question in the questionnaire distributed by the plaintiff to her co-workers asked whether assistant district attorneys "ever feel pressured to work in political campaigns on behalf of office supported candidates?" Connick, 461 U.S. at 149, 103 S.Ct. at 1691. The court noted that this question implicated fundamental constitutional rights prohibiting the coercion of beliefs, and it further related to an important societal interest that government service should depend upon merit rather than political service. Id. Thus, because the substance of this question related to important societal and constitutional interests, it was held to be speech pertaining to a matter of public concern even though the context of the speech was to redress a personal grievance. Id.
 
 
 50
 However, as of the time of the alleged unconstitutional retaliation here, we are aware of no case holding that speech similar to that made by Plaintiffs pertained to a matter of public concern under the Connick test. See Starrett v. Wadley, 876 F.2d at 816 (finding it unnecessary to reach the issue); Gray v. Lacke, 885 F.2d at 411 (concluding that allegations of personal sexual harassment do not rise to the level of a public concern). Thus, we simply cannot conclude that the Supervisors' alleged response to Plaintiffs' complaints of sexual harassment violated any clearly established rights of Plaintiffs under the First Amendment. Medina v. City and County of Denver, 960 F.2d 1493, 1498 (10th Cir.1992).
 
 
 51
 Plaintiffs' First Amendment claim against Williams, Sackett and Mitchell suffers from the additional defect, noted before, that they were not Plaintiffs' supervisors. We are aware of no case law clearly establishing that a non-supervisor can be liable under § 1983 for responding critically to speech made by a co-employee, much less a person who, as in this case, is not even a co-employee. Accordingly, the district court erred in denying appellants' motion for summary judgment on the basis of qualified immunity with regard to Plaintiffs' First Amendment claims.
 
 CONCLUSION
 
 52
 We hold that (1) all of the Appellants are entitled to qualified immunity with respect to the Plaintiffs' Equal Protection claims; (2) Seghetti and Tolley are entitled to qualified immunity with respect to Butler's constructive discharge claim, but they have not established qualified immunity as to the constructive discharge claims of Molina and DeSomber; Williams, Sackett and Mitchell are entitled to qualified immunity on all of the Plaintiffs' constructive discharge claims; and (3) all of the Appellants are entitled to qualified immunity as to Plaintiffs' First Amendment claims.
 
 
 53
 Accordingly, we AFFIRM in part and REVERSE in part the district court's order denying the Appellants' motion for summary judgment on the defense of qualified immunity, and we REMAND for further proceedings.
 
 
 
 *
 The Honorable Robert H. McWilliams could not be present at oral argument due to inclement weather, but listened to a recording of the argument
 
 
 **
 The Honorable Elmo B. Hunter, Senior District Judge of the United States District Court for the Western District of Missouri, sitting by designation
 
 
 [1]
 Williams and Sackett were not employees of JPB, but rather were employed by the City of Worland police department and the Washakie County sheriff's office, respectively. Accordingly, they were neither the plaintiffs' supervisors nor their co-employees. Rather, the plaintiffs, as employees of JPB, merely rendered dispatch services to the police and sheriff officers, including Williams and Sackett
 
 
 [2]
 We refer to Sheriff Seghetti and Police Chief Tolley collectively as the "Supervisors." We understand that technically the Plaintiffs worked for the JPB, as opposed to working for the police or sheriff's department. However, the Police Chief and Sheriff were ex officio voting members of the JPB. As such, they exercised authority over the Plaintiffs and assumed responsibility for their working conditions. Moreover, the Police Chief and Sheriff exercised direct supervisory authority over the Officers. Tolley and Seghetti also worked in the JPB facility. Accordingly, we refer to these Defendants, and treat them, as "Supervisors."
 
 
 [3]
 Defendant Mitchell was sued largely because his suggestions to dismantle the JPB were perceived to be retaliation for complaints filed by the plaintiffs
 
 
 [4]
 The district court held that under Owen v. City of Independence, 445 U.S. 622, 650, 100 S.Ct. 1398, 1450, 63 L.Ed.2d 673 (1980), a municipal entity cannot claim qualified immunity. That ruling was not appealed
 
 
 [5]
 The Eighth Circuit implicitly joined Bohen in Headley v. Bacon, 828 F.2d 1272, 1274-75 (8th Cir.1987), but that decision was not issued until September of 1987, which was after Butler had resigned
 
 
 [6]
 Plaintiffs Molina and DeSomber quit in May 1990. However, they testified that after Williams was reprimanded in September 1989 for his conduct toward Molina, they suffered primarily retribution for the complaint, as opposed to continued sexual harassment
 
 
 [7]
 Even before May of 1989 the evidence was that the Supervisors had scheduled a hearing to deal with Butler's complaint promptly after receiving her complaint and there was no indication that the hearing would not have been effective had Butler showed up
 
 
 [8]
 In September 1989 Molina also filed a complaint with the Wyoming Fair Employment Commission. However, since Williams ceased his harassment the Commission put that case on hold, and Molina agreed no further action was needed
 
 
 [9]
 The district court noted that the JPB employment manual prohibited sexual harassment and discrimination
 
 
 [10]
 Of course, actual knowledge by the supervisor may be proven circumstantially, but it is actual knowledge that must be alleged and proved
 
 
 [11]
 Merely characterizing the negligence as "gross" does not change its essential character. Negligence is carelessness and gross negligence is simply gross carelessness. Neither simple nor gross negligence implies an intentional and deliberate violation of constitutional rights, and consequently neither form of negligence satisfies the scienter requirement of § 1983. In contrast, recklessness does include an element of deliberateness--"a conscious acceptance of a known, serious risk." Archuleta v. McShan, 897 F.2d at 499 (emphasis added). As such, recklessness is generally regarded as satisfying the scienter requirement of section 1983 because it requires proof that the defendant focused upon the risk of unconstitutional conduct and deliberately assumed or acquiesced in such risk. Id. at 499. However, merely asserting that the defendant "should have known" of unconstitutional behavior on behalf of his or her subordinates without establishing an intentional, conscious, and deliberate act by the defendant participating in, or knowingly acquiescing in, the unconstitutional behavior fails to allege the requisite scienter for § 1983 liability
 
 
 [12]
 The Plaintiffs did not establish that Defendant Mitchell perpetrated or consciously failed to prevent sexual harassment against them. Accordingly, we conclude that no Equal Protection claim was shown against him
 
 
 [13]
 There is no dispute in this case about Plaintiffs' protectable property or liberty interest in their jobs
 
 
 [14]
 There was not sufficient evidence in the record other than generalized speculation that the Officers conspired with the Supervisors to create such adverse working conditions that the Plaintiffs would be forced to resign. We do not address whether the Officers might have liability under the Due Process Clause under different facts not presented by this record
 
 
 [15]
 Mitchell was not in a position of authority over the Plaintiffs and thus he is also entitled to qualified immunity on this claim. In addition, nothing alleged against him even remotely rises to the level of constructive discharge. He is accused of having proposed the disbanding of JPB and the reorganization of dispatcher services and of having called DeSomber a liar at a meeting. There is no indication that such reorganization ever occurred, and no one told the Plaintiffs that they would be fired or lose their jobs. Under no stretch of the facts could Mitchell be said to have acted in such a way as to make the Plaintiffs' jobs so intolerable that a reasonable person in plaintiffs' position would have concluded that she had no choice but to resign
 
 
 [16]
 Molina's complaint was the most specific, and she noted merely that "[i]t has further come to my attention that other dispatchers have been treated with little respect in the past two weeks by Lt. Williams [sic] and have possibly suffered some of the same abuse I have in the past." Molina Depo.Ex. 1, at 2 in App. of Defendants/Appellants