Cindy RATTS, J.D. Ratts, and RTR Corporation, Plaintiffs,

v.

BOARD OF COUNTY COMMISSIONERS, HARVEY COUNTY KANSAS, The City of Newton, Kansas, Robert Maier, Phil Kloster, Robert Myers, Donald Horst, James Heinicke, and Ron Ahsmuhs, Defendants.

No. 97–4240–DES.

United States District Court, D. Kansas.

March 28, 2001.

Cheryl D. Myers, Topeka, KS, Michael B. Myers, Victorville, CA, for Cindy Ratts, J.D. Ratts, RTR Corp.

Stephanie N. Scheck, Morrison & Hecker L.L.P., Wichita, KS, Alan L. Rupe, Husch & Eppenberger, LLC, Wichita, KS, for Board of County Commissioners, Harvey County, Kansas, City of Newton, Kansas, Phil Kloster, Donald Horst, James Heinicke, Ron Ahsmuhs, Myers Law Offices, Chartered.

Monte A. Vines, Adams & Jones, Chartered, Wichita, KS, Stephanie N. Scheck, Morrison & Hecker L.L.P., Wichita, KS, Alan L. Rupe, Husch & Eppenberger, LLC, Wichita, KS, for Robert Myers.

James S. Pigg, Kristine A. Larscheid, Fisher, Patterson, Sayler & Smith, Topeka, KS, for Robert Eugene Maier.

## MEMORANDUM AND ORDER

SAFFELS, District Judge.

This matter is before the court on defendants' Motions for Summary Judgment (Docs.218, 221). For purposes of representation, the defendants are divided into two groups: defendant Robert Maier has submitted his own motion (Doc. 218), and the rest of the defendants, including the City of Newton, Kansas ("City"), and the Board of County Commissioners, Harvey County Kansas ("County"), have filed a separate motion (Doc. 221). Plaintiffs have filed a consolidated response (Doc. 237), and both sets of defendants have filed replies (Docs. 248, 249). The court is now prepared to rule on both motions.

● **PROCEDURAL HISTORY**

Plaintiffs filed their complaint in this matter on December 10, 1997. Shortly thereafter, on January 6, 1998, plaintiffs filed an Amended Verified Complaint (Doc. 3). Plaintiffs were subsequently granted leave to file an amended complaint, and on April 10, 1998, plaintiffs filed a Second Amended Verified Complaint (Doc. 26). Defendants then filed motions to strike plaintiffs' complaint. Hence, on September 1, 1998, defendants' motions to strike were granted and plaintiffs were given leave to file a third amended complaint. Finally, on September 8, 1998, plaintiffs filed their Third Amended Verified Complaint (Doc. 104). The case has proceeded under this fourth and final complaint.

According to an agreement by the parties, on October 10, 1998, the court dismissed with prejudice all professional liability claims brought against defendant Robert Myers. Remaining for resolution are claims brought against Robert Myers in his capacity as City Attorney for the City.

Defendant Phil Kloster filed his Notice and Suggestions of Bankruptcy (Doc. 205) with the court on February 10, 2000. Therefore, the case has been stayed pursuant to 11 U.S.C. § 362 as to Phil Kloster. While § 362 extends stay provisions of the Bankruptcy Code to the "debtor," the rule followed in the Tenth Circuit and by the majority of other circuits is that the stay provision does not extend to the debtor's co-defendants. *See Fortier v. Dona Anna Plaza Partners,* 747 F.2d 1324, 1330 (10th Cir .1984). There does exist a narrow exception to this general rule, see *A.H. Robins Co. v. Piccinin,* 788 F.2d 994, 999

(4th Cir.), *cert. denied,* 479 U.S. 876, 107 S.Ct. 251, 93 L.Ed.2d 177 (1986), yet none of the defendants have attempted to argue their inclusion within the exception. Therefore, the case continues unimpeded as against the remaining defendants.

On February 28, 2000, this court issued an Order (Doc. 206) dismissing RTR Corporation as a party-plaintiff. All claims brought by RTR Corporation have been dismissed with prejudice.

## ● FACTUAL BACKGROUND

Plaintiffs Cindy Ratts and J.D. Ratts are husband and wife. This action ostensibly arises from Ms. Ratts' employment at the Newton City/County Airport ("airport"). Plaintiffs' claims, which will be discussed in further detail, are generally premised on Ms. Ratts' alleged suffering of sexual harassment and gender discrimination at the hands of the defendants.

The airport is jointly owned by the City and County. It is controverted as to whether both the City and County manage the operations at the airport. It is uncontroverted, however, that while employed at the airport Ms. Ratts was an employee of the City. Ms. Ratts contends that she was also, for the purposes of her employment related claims, an employee of the County.

Ms. Ratts began her employment at the airport on August 10, 1979, as a Line Attendant I.[1] She was hired by then Airport Manager, Jim McFarland. Mr. McFarland was subsequently replaced by defendant Robert Maier in March 1985.

Throughout most of Ms. Ratts' employment, Mr. Maier had full operational control of all activities at the airport and was Ms. Ratts' supervisor. Phil Kloster began working as City Manager on March 2, 1990. He was later replaced by James Heinicke in the summer of 1997. As Airport Manager, Mr. Maier reported directly to the City Manager. In 1986, Ms. Ratts was promoted to Line Attendant II, and in March of 1987 she was promoted again to Accounting Clerk III/Office Manager.[2]

At some point in the late 1980's, Ms. Ratts and Mr. Maier began having sexual contacts. It is controverted as to whether these contacts were the product of a consensual sexual affair or, as Ms. Ratts alleges in her deposition, the product of Mr. Maier's intimidation and influence over her. Just as there is no definite starting date in regards to these contacts, the parties are inconsistent as to when they ceased. Apparently, the sexual contacts ended in either 1991 or 1992.

From 1991 through 1992, till Ms. Ratts' eventual transfer from the airport in 1997, very little of the factual record is uncontroverted. Defendants concede that the atmosphere at the airport was casual and that employees regularly shared stories and jokes of a sexual nature. Ms. Ratts alleges that the atmosphere was full of unwanted and unwelcomed sexual advances on the part of Mr. Maier. The parties greatly dispute what actually took place between Mr. Maier, Ms. Ratts, and

1. When Ms. Ratts took the position of Line Attendant I the job entailed refueling aircraft, servicing aircraft, cleaning the office areas, and cleaning hangars. (Cindy Ratts Dep. at 10).

2. As the Accounting Clerk III/Office Manager, Ms. Ratts was responsible for "all accounting, bill-outs, tax reports, commission reports, receptions duties, T hangar rentals, leases, answering the telephone, setting up rental cars,

catering, answering the Unicom, instructing line attendants on specific fuel orders they needed to attend to." (Cindy Ratts Dep. at 43).

Ms. Ratts' position appears to also have made her a quasi assistant airport manager, for when the airport manager was physically absent from the airport she was responsible for the airport's operation. (Phil Kloster Dep. at 79).

other airport personnel. Additionally, the parties strongly disagree as to the impact various statements, gestures, physical contact, and adult material had on Ms. Ratts' working environment. Plaintiffs identify numerous instances of allegedly sexually centered behavior observed or rendered upon Ms. Ratts by Messrs. Maier or Kloster. Instead of detailing the supposed record of sexual harassment at this point, the court will address the particulars of these contacts when analyzing the sufficiency of the plaintiffs' evidence in relation to the defendants' motions.

In January 1996, Ms. Ratts discussed Mr. Maier's allegedly inappropriate behavior with the City of Newton Fire Chief, Jim Jackson. Mr. Jackson then relayed Ms. Ratts' concerns to the City Manager, Mr. Kloster. It is uncontroverted that Ms. Ratts approached Mr. Jackson approximately six months prior to the January conversation with her concerns regarding Mr. Maier. The parties disagree, however, as to the full breadth of this earlier meeting. The official investigation of Ms. Ratts' allegations began when Mr. Jackson contacted Mr. Kloster. It is uncontroverted that the City had no official sexual harassment policy prior to March 1, 1996.

On or about January 23, 1996, City Attorney Robert Myers, Mr. Kloster, and Mr. Lon Walker[3] met with Mr. Maier and informed him of the complaint made against him by Ms. Ratts. At that time. Mr. Maier was placed on indefinite suspension and relieved of his duties at the airport. Ultimately, Mr. Maier did not return to the airport—instead he was permanently transferred to a non-supervisory position with the City of Newton Fire Department. Mr. Maier's transfer represented a demotion in authority and a reduction in salary.

After the preliminary investigation was underway by City officials, Ms. Ratts was granted a medical leave and encouraged to seek counseling by Mr. Kloster. Ms. Ratts subsequently returned to work on February 14, 1996. Upon her return, the daily operations of the airport were controlled by Ms. Stephanie Weber. Ms. Weber apparently held the position of Line Attendant I before being placed in charge of the airport's operations.

The record submitted by the parties is quite confusing in regards to who was the ultimate authority at the airport after Mr. Maier was relieved. Defendants submit that Mr. Kloster placed Ron Ashmuhs, the City's Director of Finance, in charge of the airport at some undisclosed time after Ms. Ratts returned in February. Plaintiffs contend that such an appointment was in title only, and that Ms. Ratts was responsible for the airport's operations.[4]

After Ms. Ratts' return in February 1996, she called City Attorney, Robert Myers, to complain about the treatment she was receiving from the airport personnel. Specifically, she complained that her co-workers were refusing to speak to her and that "wild rumors" were circulating regarding her claim against Mr. Maier. In response, Messrs. Myers and Kloster went to the airport and discussed the situation with the employees. The parties strongly dispute what was said at this meeting.[5] Plaintiffs contend that airport

---

**3.** Mr. Lon Walker was apparently the Director of Public Works for the City.

**4.** Mr. Ashmuhs testified that on average he spent "just slightly over two hours" at the airport per week. (Ron Ashmuhs Dep. at 12). Additionally, Ms. Ratts testified that Mr. Ashmuhs instructed her to send a letter to the

"911" director of communications informing him that she was the on-site acting airport manager.

**5.** In his deposition, Mr. Myers testified as follows:

personnel were instructed not to speak to Ms. Ratts regarding her claims of sexual harassment by Mr. Maier. According to the defendants, all of Ms. Ratts' allegations of mistreatment were investigated and shown to be unsubstantiated. Plaintiffs disagree with defendants' assertion.

On May 19, 1997, Ms. Ratts was relieved of her duties at the airport and transferred to the Newton Public Library. It is highly contested whether such a move was a lateral transfer, as the defendants contend, or rather a demotion, as plaintiffs argue. It is uncontroverted, however, that Ms. Ratts did not request to be relocated to the library. The parties dispute whether Ms. Ratts' transfer was temporary or permanent.

● **STATUTORY REQUIREMENTS**

On October 18, 1996, Ms. Ratts filed her original charge regarding employment discrimination/employment disability discrimination/sexual harassment/retaliation jointly with the Kansas Human Rights Commission ("KHRC") and the Equal Employment Opportunity Commission ("EEOC"). An amended charge was filed with both organizations on July 7, 1997. On September 29, 1997, Ms. Ratts received her right to sue letter from the EEOC.

● **PLAINTIFFS' CLAIMS**

Plaintiffs bring numerous federal and state law claims against the defendants. As for the federal claims, Ms. Ratts asserts: (1) claims against the City and County pursuant to 42 U.S.C. §§ 2000e *et seq.* ("Title VII") and the Kansas Act Against Discrimination ("KAAD") for sexual harassment; (2) claims against the City and County pursuant to Title VII and

the KAAD for retaliation; (3) claims against the City and County pursuant to Title VII and the KAAD for gender discrimination; (4) claims against all of the defendants pursuant to 42 U.S.C. § 1983; (5) claims against the City and County pursuant to Title I of the Americans with Disabilities Act of 1964, 42 U.S.C. § 12101 *et seq.* ("ADA") and the KAAD.

As for the state law claims, Ms. Ratts asserts: (1) claims against the City and County for negligence; (2) claims against all of the defendants for invasion of privacy, false light, and breach of confidentiality; (3) claims against all of the defendants for loss of consortium; (4) claims against all of the defendants for tortious interference with prospective business relations; (5) claims against all of the defendants for conspiracy to interfere with livelihood; (6) claims against all of the defendants for intentional infliction of emotional distress.

Mr. Ratts joins his wife in the assertion of her state law claims for: (1) loss of consortium; (2) intentional infliction of emotional distress; and (3) invasion of privacy. The defendants collectively seek summary judgment on all of the plaintiff's claims.

● **STANDARD OF REVIEW**

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The rule provides that "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*

---

Question: Did you address directly in any fashion the fact that Cindy [Ms. Ratts] felt she had been ostracized or shut out or that people were refusing to speak to her?

Answer: No
(Robert Myers' Dep. at 70).

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The substantive law identifies which facts are material. *Id.* at 248, 106 S.Ct. 2505. A dispute over a material fact is genuine when the evidence is such that a reasonable jury could find for the nonmovant. *Id.* "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*

The movant has the initial burden of showing the absence of a genuine issue of material fact. *Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir. 1993). The movant may discharge its burden "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The movant need not negate the nonmovant's claim. *Id.* at 323, 106 S.Ct. 2548. Once the movant makes a properly supported motion, the nonmovant must do more than merely show there is some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The nonmovant must go beyond the pleadings and, by affidavits or depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548 (interpreting Fed.R.Civ.P. 56(e)). Rule 56(c) requires the court to enter summary judgment against a nonmovant who fails to make a showing sufficient to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof. *Id.* at 322, 106 S.Ct. 2548. Such a complete failure of proof on an essential element of the nonmovant's case renders all other facts immaterial. *Id.* at 323, 106 S.Ct. 2548.

A court must view the facts in the light most favorable to the nonmovant and allow the nonmovant the benefit of all reasonable inferences to be drawn from the evidence. *See, e.g., United States v. O'Block*, 788 F.2d 1433, 1435 (10th Cir.1986) ("The court must consider factual inferences tending to show triable issues in the light most favorable to the existence of those issues."). The court's function is not to weigh the evidence, but merely to determine whether there is sufficient evidence favoring the nonmovant for a finder of fact to return a verdict in that party's favor. *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505. Essentially, the court performs the threshold inquiry of determining whether a trial is necessary. *Id.* at 250, 106 S.Ct. 2505.

● **DISCUSSION**

● **Federal Claims**

● **Kansas Act Against Discrimination Claims**

■ Defendants move for summary judgment on plaintiffs' KAAD claims on the grounds that plaintiffs failed to exhaust their administrative remedies. While plaintiffs dual filed with the EEOC and the KHRC on October 18, 1996, plaintiffs only assert that they received a right to sue letter from the EEOC. A plaintiff may not rely on an EEOC notice as proof of his exhaustion of remedies under state law. *See Daneshvar v. Graphic Tech., Inc.*, 18 F.Supp.2d 1277, 1285 (D.Kan.1998) (granting summary judgment on a plaintiff's KAAD claims when he dual filed but failed to receive a notice of right to sue from the KHRC). Accordingly, the court must grant summary judgment for all of plaintiffs' KAAD claims as to all defendants.

● **Title VII Claims**

● **Proper Parties**

■ Ms. Ratts brings her Title VII claims against both the City and County.

As a preliminary jurisdictional issue, Ms. Ratts must establish that both entities fall within the statutory definition of "employer" provided in 42 U.S.C. § 2000e(b).[6] See Zinn v. McKune, 143 F.3d 1353, 1356–57 (10th Cir.1998). Both parties submit that Ms. Ratts has satisfied this requirement as to the City. The issue remains whether Ms. Ratts was also an employee[7] of the County.

Acknowledging the circular nature of the definitions employed by Title VII, the Tenth Circuit has held that the definitions "should be fleshed out by applying the common-law agency principles to the facts and circumstances surrounding the working relationship of the parties." Id. at 1357 (citing Lambertsen v. Utah Dept. of Corrections, 79 F.3d 1024, 1028 (10th Cir. 1996)). Therefore, the main focus of this analysis is whether and to what extent the County had the "right to control the 'means and manner'" of Ms. Ratts' performance. Id. (internal citation and quotation marks omitted). This inquiry also requires the court to consider the following factors:

(1) the kind of occupation at issue, with reference to whether the work usually is done under the direction of a supervisor or is done by a specialist without supervision; (2) the skill required in the particular occupation; (3) whether the employer or the employee furnishes the equipment used and the place of work; (4) the length of time the individual has worked; (5) the method of payment, whether by time or by job; (6) the manner in which the work relationship is terminated; (7) whether annual leave is afforded; (8) whether the work is an integral part of the business of the employer; (9) whether the worker accumulates retirement benefits; (10) whether the employer pays social security taxes; and (11) the intention of the parties.

Lambertsen, 79 F.3d at 1028. The court must look to the totality of the circumstances: no one factor is determinative. See id.

Ms. Ratts submits that she was an employee of the County primarily because (1) the City and County jointly own the airport; (2) management of the airport is subject to the joint policies of the City and County; (3) the Aviation Commission[8] is comprised of members representing the City and County; and (4) the City must consult with the County Administrator prior to appointing or terminating an airport manager, preparing an annual budget for the airport, preparing any capital improvements, and making applications for any federal funding.

Ms. Ratts' argument is heavily founded on the County's equal ownership of the airport. She has presented no evidence regarding how the County affected the daily manner of her work performance. In fact, the evidence offered by plaintiffs seems to belie Ms. Ratts' position, for a contract entered into by the City and the County specifically indicates that the City will be responsible for the active manage-

---

6. Title VII defines "employer" as "a person ... who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person...." 42 U.S.C. § 2000e(b).

7. Title VII defines "employee" as "an individual employed by an employer...." 42 U.S.C. § 2000e(f).

8. The Aviation Commission ("Commission") was established on behalf of the City and County. The Commission "shall consider, study, investigate, review and make recommendations upon all aviation matters referred to it by the [City and County], or which it shall deem in the best interests of the development and improvement of the Newton City–County Airport." (Pls.' Ex. 13).

ment of the airport. (Pls.' Ex. 15). Therefore, Ms. Ratts is attempting to impose employer liability upon the County merely because it is a part-owner of the airport. However, this assertion misinterprets the point and focus of the "means and manner" test. *See Zinn,* 143 F.3d at 1357–59 (finding a nurse employed by a private corporation but physically working within a state owned prison was not an employee of the state even though the state placed some restrictions on her activities within the prison). No evidence has been presented that would establish the requisite degree of control over Ms. Ratts' working performance. Therefore, Ms. Ratts has failed to provide sufficient evidence indicating that the County was her employer. Summary judgment is appropriate for the County on the Title VII claims.

● **Sexual Harassment**

● **Statute of Limitations**

The City asserts that most of the incidents supporting Ms. Ratts' Title VII sexual harassment claim are time-barred. According to 42 U.S.C. § 2000e-5(e), a charge of discrimination must be filed with the EEOC within 300 days of the alleged unlawful act.[9] This filing is a prerequisite to bringing a Title VII claim. *See Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 47, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974). Ms. Ratts filed her original charge of discrimination with the EEOC on October 18, 1996. She admits that a substantial number of the alleged acts of harassment occurred outside the time limit imposed by Title VII. However, she also asserts that several acts occurred within the time period. Ms. Ratts urges the court to apply the

continuing course of conduct doctrine to her claim. Under this doctrine, a plaintiff's claim may include incidents of unlawful acts outside the time period if the various acts represent a "continuing pattern of discrimination." *Furr v. AT&T Techs., Inc.,* 824 F.2d 1537, 1543 (10th Cir.1987). The doctrine has been extended to Title VII claims. *See Allen v. Denver Pub. Sch. Bd.,* 928 F.2d 978, 984 (10th Cir.1991), *disapproved of on other grounds by Kendrick v. Penske Transp. Servs., Inc.,* 220 F.3d 1220, 1228 (10th Cir.2000).

For the doctrine to apply, Ms. Ratts must first demonstrate at least one incident of harassment, which occurred within the statutory period, i.e., within the 300 days preceding October 18, 1996. *See Martin v. Nannie & The Newborns, Inc.,* 3 F.3d 1410, 1415 (10th Cir.1993). Second, Ms. Ratts must establish that the acts falling outside the time period are part of a continuing practice of harassment, which includes acts within the time period. *See id.*

To determine the applicability of this doctrine, the court now turns to Ms. Ratts' allegations of sexual harassment. Ms. Ratts alleges that the following acts of harassment occurred during her employment with the City:[10]

● In 1987 and 1989, three instances of nonconsensual sexual contact occurred between Ms. Ratts and Mr. Maier;

● On August 31, 1994, Mr. Maier exposed his genitalia to Ms. Ratts;

● On September 1, 1994, Mr. Maier asked to put City pins on Ms. Ratts' breasts so he could read from "one tit to the other;"

9. The 300 day limitation applies in those states such as Kansas that have statutorily prohibited discrimination, otherwise, the limit is 180 days.

10. The list does not include all of Ms. Ratts' allegations, the court has considered only those allegations that are presented with some degree of particularity.

- On September 15, 1994, Mr. Maier informed Ms. Ratts that he was ill due to lack of sexual intercourse;

- In the fall of 1994, Mr. Maier informed Ms. Ratts that he thought of her while masturbating;

- On March 13, 1995, Mr. Maier intentionally placed his aroused groin against Ms. Ratts;

- On March 13, 1995, Mr. Maier informed Ms. Ratts that she should wear shorter dresses so she could bend over and pick things off the floor;

- On March 13, 1995, Mr. Maier informed Ms. Ratts of his intent to rape her;

- On April 4, 1995, Mr. Maier made a comment regarding his "heat seeking moisture missile;"

- On April 4, 1995, Mr. Maier restrained Ms. Ratts by the arm and placed his mouth near her breast and simulated nursing;

- On May 3, 1995, Mr. Maier, while "looking Ms. Ratts up and down," stated he wanted a "million bucks to retire or excellent fringe benefits to stay;"

- At undisclosed times throughout her employment, Mr. Maier would store pornographic magazines at his workstation;

- In November 1995, Mr. Maier invited Ms. Ratts to view a training tape, when in reality Ms. Ratts viewed a portion of a pornographic video depicting sex acts;

- On November 27, 1995, Mr. Maier informed Ms. Ratts that he wanted to find her "go button;"

- Twice in November and December 1995, Mr. Maier told Ms. Ratts of his intent to rape her;

- Throughout November and December 1995, Mr. Maier intentionally placed his aroused groin against Ms. Ratts;

- On more than one occasion during October, November, and December 1995, Mr. Maier choked Ms. Ratts when he caught her attempting to document his harassment on her computer;

- On December 27, 1995, Mr. Maier informed Ms. Ratts that he hoped to "find her little box under the Christmas tree;"

- On or about January 1, 1996, Mr. Maier rubbed his groin to the point of arousal in front of Ms. Ratts.

After considering these allegations, the court finds that allegations fifteen through nineteen occurred within the appropriate time period. Therefore, the court finds that Ms. Ratts has satisfied the first requirement for employing the continuing course of conduct doctrine by demonstrating at least one act of harassment within the statutory period.

To determine whether the second step has been satisfied, i.e., whether the alleged acts of harassment amount to a discriminatory practice, the Tenth Circuit has adopted the approach taken by the Fifth Circuit in *Berry v. Board of Supervisors of Louisiana State Univ.,* 715 F.2d 971, 981 (5th Cir.1983). *See Martin,* 3 F.3d at 1415. This approach requires the court to consider several nonexclusive factors relevant to the continuing course of conduct question. The first factor is subject matter. Do the alleged violations constitute the same type of discrimination? The second factor is frequency. Were the alleged violations isolated and infrequent or recurring? The third factor is permanence. Was the nature of the alleged violations such that it should trigger an employee's awareness of the need to assert her rights and would the consequences of the act

continue in the absence of a continuing intent to discriminate? *See id.*

The City argues Ms. Ratts fails to satisfy this three pronged analysis. As for the first factor, the court finds that the majority of Ms. Ratts' submitted violations concern the same subject matter, i.e., sexual misbehavior committed by Mr. Maier. However, as to the second factor, frequency, the court finds a significant time break separates the allegations of sexual contact in 1987 and 1989 as compared to the eighteen other alleged incidents. A five or seven year hiatus of activity is difficult to assimilate within a definition of frequent.

The City strongly contests the third and final factor of permanence. Of the numerous violations Ms. Ratts alleges, the most egregious concern her allegedly nonconsensual sexual contacts with Mr. Maier. She indicates three specific instances of rape. She alleges two acts of nonconsensual sexual intercourse occurred in 1987, and she further alleges one act of nonconsensual oral sex occurred in 1989. However, Ms. Ratts waited until 1996 to file her charge with the EEOC. The City asserts that nonconsensual sexual activity should have alerted Ms. Ratts that her rights were being violated and prompted her to file a contemporaneous charge. As to this issue, the Tenth Circuit has stated:

> The continuing violation doctrine is premised on the equitable notion that the statute of limitations should not begin to run until a reasonable person would be aware that his or her rights have been violated. The permanence prong of the *Berry* test limits the reach of the continuing violation theory by restricting its operation to those situations underscored by its equitable foundation. That is, if an event or series of events should have alerted a person to act to assert his or her rights at the time of the violation, the victim cannot later rely on the continuing violation doctrine to overcome the statutory requirement of filing a charge with the EEOC with respect to that event or series of events.

*Martin,* 3 F.3d at 1415, n. 6 (internal citations omitted). The Tenth Circuit, however, examines all three factors in the totality. For example, in *Martin,* the court found that the plaintiff provided sufficient evidence to demonstrate a genuine issue of material fact concerning the existence of a continuing violation notwithstanding that the plaintiff allowed sexual harassment, including an incident of rape, to continue for an extended period of time [11] before she filed a charge with the EEOC. *See id.* at 1416. The *Martin* court submitted that "[c]ertainly, some of the events, including the rape, should have been reported at the time they occurred.... However, given the analysis under the first two factors, we believe that Martin has shown enough to avoid summary judgment on the statute of limitations issue." *Id.*

It appears, therefore, that if a plaintiff can successfully demonstrate the first two factors of the *Martin* test (subject matter and frequency), then a lesser showing in the third factor will not be fatal to the application of the continuing course of conduct doctrine. The facts of the present case, however, do not illustrate this situation. Although Ms. Ratts satisfies the first factor, her showing as to frequency is insufficient considering the five to seven year gap in alleged incidents. The court is not compelled to invoke an essentially equitable doctrine to assist a plaintiff who had notice that her rights were being violated yet, for whatever reason, waited

---

11. A period of nearly two years separated the alleged rape and plaintiff's filing of a charge with the EEOC. *See Martin,* 3 F.3d at 1412–13.

years to take action. *See, e.g., Holmes v. Regents of the Univ. of Colorado*, 176 F.3d 488 (10th Cir.1999) (table) (denying the continuing violation doctrine to a Title VII plaintiff in part "because her claims fail[ed] both the frequency and permanence prongs").

The court, however, does find sufficient grounds to apply the continuing course of conduct doctrine in a limited fashion. The significant time-break between the alleged acts of nonconsensual sexual contact in the late 1980's and the remaining incidents of harassment is significant. Although the court finds that attempting to extend the continuing course of conduct doctrine to include the alleged rapes is ill-advised under *Martin*, the court does find that applying the doctrine to the remaining incidents is appropriate in this case. The above incidents numbered two through nineteen all involve the same subject matter, they occur frequently and without interruption over three years, and no single incident is so overwhelmingly egregious as to presume notice on the part of Ms. Ratts. Therefore, the court will apply the doctrine to this case, but the court will only consider the incidents alleged to have occurred in 1994, 1995, and 1996 in determining whether the alleged incidents are sufficient to establish a claim for sexual harassment. *See Martin*, 3 F.3d at 1416.

● **Distinction of Claims**

■ Plaintiffs' complaint asserts two seemingly independent theories of sexual harassment pursuant to Title VII: quid pro quo and hostile work environment. However, in *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) and *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275,

141 L.Ed.2d 662 (1998) the Supreme Court de-emphasized these traditional distinctions. *See Ellerth*, 524 U.S. at 753, 118 S.Ct. 2257 (holding the distinction is only significant relative to the threshold question of whether actionable conduct occurred). While a hostile environment claim may proceed upon evidence of threatened (constructive) job detriment, a quid pro quo claim may only be supported by evidence that actual tangible employment action was suffered by the plaintiff. *See id. See also Curry v. District of Columbia*, 195 F.3d 654, 659 (D.C.Cir.1999) (noting that quid pro quo harassment constitutes an explicit alteration of the terms or conditions of employment, whereas a hostile working environment constitutes a constructive alteration of the terms or conditions of employment). In other words, the question of tangible employment action operates as the initial "fork" in the sexual harassment road. If the plaintiff did not suffer any employment detriment, then the plaintiff's claim is generally reviewed under the traditional hostile environment analysis. If action was taken, then the analysis shifts to the quid pro quo side. For the sake of clarity to the parties, the court will retain their use of the traditional nomenclature.[12]

**(1). Quid Pro Quo**

■ A plaintiff can demonstrate she was subjected to actionable harassment by establishing "that a tangible employment action resulted from [her] refusal to submit to a supervisor's sexual demands." *Ellerth*, 524 U.S. at 753, 118 S.Ct. 2257. The defendant-employer may refute such a claim by proving that no negative action befell the plaintiff. *See Smith v. Cash-*

---

**12.** The court recognizes that the actual impact of *Ellerth* and *Faragher* are felt within the employer liability analysis. The question of tangible employment action was always present in the traditional elements of quid pro quo. *See Starrett v. Wadley*, 876 F.2d 808, 820 (10th Cir.1989).

land, Inc., 193 F.3d 1158, 1160 (10th Cir. 1999).

In her deposition, Ms. Ratts testifies that she felt pressure to "go along with the sexual harassment" or her job evaluations would be marked down. (Cindy Ratts Dep. at 153). She also indicates that she feared losing her job if she refused Mr. Maier's requests for sexual contact. (Cindy Ratts Dep. at 86). However, Ms. Ratts presents no evidence that any of her fears were realized. In fact, the record indicates that Mr. Maier helped increase Ms. Ratts' salary while at the same time allegedly pressuring her for sexual contact. Ms. Ratts argues that she suffered the job detriment of mental anguish due to Mr. Maier's harassment, yet this type of "detriment" is outside the interpretation espoused by the Supreme Court. See Faragher, 524 U.S. at 808, 118 S.Ct. 2275 ("a tangible employment action, such as discharge, demotion, or undesirable reassignment"). Although Ms. Ratts was eventually transferred from her position at the airport, Ms. Ratts does not argue that this transfer was the product of her refusal to acquiesce to Mr. Maier's advances. In light of Ms. Ratts' failure to produce evidence demonstrating an actual tangible employment action, the court finds summary judgment appropriate for this claim.

### (2). Hostile Work Environment

■ Ms. Ratts can also establish actionable sexual harassment under Title VII if she demonstrates she was subjected to a hostile work environment so severe or pervasive that it constructively altered the terms or conditions of her employment. See Harris v. Forklift Sys., Inc., 510 U.S. 17, 20, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); Penry v. Federal Home Loan Bank, 155 F.3d 1257, 1261

(10th Cir.1998) (quoting Davis v. United States Postal Serv., 142 F.3d 1334, 1341 (10th Cir.1998)). "While the plaintiff must make a showing that the environment was both objectively and subjectively hostile, she need not demonstrate psychological harm, nor is she required to show her work suffered as a result of the harassment." Penry, 155 F.3d at 1261 (citing Davis, 142 F.3d at 1341).

Title VII, however, does not provide redress for a working environment "merely tinged with offensive sexual connotations." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). The court is charged with the duty of filtering "out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." Faragher, 524 U.S. at 788, 118 S.Ct. 2275. Within the context of motions for summary judgment, the Tenth Circuit has cautioned courts that "the existence of sexual harassment must be determined 'in light of the record as a whole,' and the trier of fact must examine the totality of the circumstances, including 'the context in which the alleged incidents occurred.' " Penry, 155 F.3d at 1262 (quoting Meritor, 477 U.S. at 69, 106 S.Ct. 2399). Finally, a plaintiff must produce evidence that she was the object of harassment because of her gender. Conduct that is overtly sexual may be presumed to be motivated by a gender animus. See id. at 1261.

With this standard in mind, the court now returns to Ms. Ratts' alleged acts of harassment. See infra at 1313–16 (listing Ms. Ratts' allegations of harassment). The City contends that Ms. Ratts did not subjectively find the alleged acts to be offensive. "Judged in the context of an atmosphere where the employees tolerated sexual jokes and comments, supplied their

co-workers with pornography and engaged in consensual sexual conduct, plaintiff's complaints of harassment are ill-founded. Plaintiff voluntarily engaged in the very conduct she now alleges was inappropriate and actionable." (Defs.' Mem. at 41). The court disagrees with the City's reasoning. In *Meritor*, the Supreme Court noted:

> But the fact that sex-related conduct was "voluntary," in the sense that the complainant was not forced to participate against her will, is not a defense to a sexual harassment suit brought under Title VII. The gravamen of any sexual harassment claim is that the alleged sexual advances were "unwelcome." While the question of whether particular conduct was indeed unwelcome presents difficult problems of proof and turns largely on credibility determinations committed to the trier of fact, the District Court in this case erroneously focused on the "voluntariness" of respondent's participation in the claimed sexual episodes.

477 U.S. at 68, 106 S.Ct. 2399 (internal citation omitted). Ms. Ratts testified throughout her deposition that Mr. Maier's sexual advances and sexually explicit behavior were unwelcomed. She testified that she personally did not participate in sexually explicit conversations with Mr. Maier. (Cindy Ratts Dep. at 723). Additionally, the record indicates that Ms. Ratts would make remarks or complaints in regards to some of the sexually explicit comments made by Mr. Maier and other airport personnel. (Robert Maier Dep. at 38–40). Finally, Ms. Ratts testified that she told Mr. Maier that the pornography at the workplace was inappropriate. (Cindy Ratts Dep. at 381).

When viewed in the light most favorable to Ms. Ratts, the court finds that Ms.

Ratts has produced sufficient evidence demonstrating her subjective disdain for the alleged conduct. The City does not dispute that the alleged conduct would be objectively offensive.

The court also finds that Ms. Ratts has presented sufficient evidence demonstrating that the alleged harassment was both severe and pervasive enough to represent a hostile environment. When viewed in the light most favorable to Ms. Ratts, the conduct of Mr. Maier created an environment sexually charged beyond the mere trappings of an ordinary workplace. *See Lockard v. Pizza Hut, Inc.*, 162 F.3d 1062, 1072 (10th Cir.1998) (harassing conduct by two male customers of waitress in restaurant was severe enough to create hostile work environment where men commented on her perfume, grabbed her by the hair and one of them grabbed her breast and placed his mouth on it); *Dunegan v. City of Council Grove*, 77 F.Supp.2d 1192, 1198 (D.Kan.1999) (denying summary judgment when evidence demonstrated a single incident in which a male supervisor hugged a female from behind while grabbing her breast and kissing her neck). The court, therefore, finds summary judgment inappropriate on this issue.

■ The court now turns to the issue of employer liability.[13] It is at this point that the true impact of *Ellerth* and *Faragher* is felt. In *Faragher*, the Court held the following:

> An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to lia-

---

13. It is apparent from plaintiffs' papers that Ms. Ratts' claim against the City is premised on a theory of vicarious liability. The court will limit its discussion to this line of analysis.

bility or damages.... The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

524 U.S. at 807, 118 S.Ct. 2275. Because the court has already determined that Ms. Ratts did not suffer tangible employment action (and in doing so determined she had no claim for quid pro quo harassment), the City may assert its affirmative defense. The court's inquiry into the defense is premised on the reasonableness of both parties' actions.

First, did the City exercise reasonable care to prevent and correct any sexually harassing behavior? In *Faragher*, the defendant city had a sexual harassment policy in place, yet the defendant failed to properly disseminate the policy among its employees. The Supreme Court found that "[u]nder such circumstances, we hold as a matter of law, that the City could not be found to have exercised reasonable care to prevent the supervisors' harassing conduct." *Id.* at 808, 118 S.Ct. 2275. The Court further stated:

Unlike the employer of a small work force, who might expect that sufficient care to prevent tortious behavior could be exercised informally, those responsible for city operations could not reasonably have thought that precautions against hostile environments in any one of many departments in far-flung locations could be effective without communicating some formal policy against harassment, with a sensible complaint procedure.

*Id.* at 808–09, 118 S.Ct. 2275. In the present case, the City failed to even create, let alone disseminate, an official sexual harassment policy until 1996. Considering that Ms. Ratts had no policy to rely upon or procedure for lodging complaints, the court finds that Ms. Ratts has raised a disputed issue of material fact as to whether the City took reasonable care to prevent and correct sexually harassing behavior in this case.

Because the City fails to sufficiently establish the first element of its defense, there is no need to analyze the reasonableness of Ms. Ratts' actions. Even with the use of its defense, the City is not entitled to judgment as a matter of law, so the court must deny summary judgment on Ms. Ratts' Title VII sexual harassment-hostile work environment claim.

● **Gender Discrimination**

Ms. Ratts next asserts a disparate treatment claim against the City. " 'Because disparate treatment is a form of intentional discrimination, the plaintiff must prove that her employer acted with a discriminatory intent or motive.' " *Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1315 (10th Cir.1999) (quoting *Faulkner v. Super Valu Stores, Inc.*, 3 F.3d 1419, 1424 (10th Cir .1993)). The now familiar burden-shifting paradigm established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) controls the court's analysis. *See Bullington*, 186 F.3d at 1315.

Under *McDonnell Douglas*, the plaintiff must first present a prima facie case of discrimination. Then, the burden of production shifts on the defendant to produce a legitimate, non-discriminatory justification for taking the action in question. Finally, the burden is redirected at the plaintiff to show the defendant's reason for its

actions was merely a pretext[14] for discrimination. See *McDonnell Douglas*, 411 U.S. at 802–05, 93 S.Ct. 1817. Ms. Ratts' claims of gender discrimination consist of two allegations. First, she asserts that because she is female she was passed over for the Airport Manager position. Second, she alleges that her transfer to the library was gender biased.

### • Failure to Hire

▮ To establish a prima facie case of gender discrimination in a failure to hire context,[15] Ms. Ratts must demonstrate: (1) she is a member of a protected class; (2) she applied for and was qualified for the Airport Manager position; (3) she was rejected despite her qualifications; and (4) the position was filled by a male applicant.[16] See *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254 & n. 6, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Sanchez v. Philip Morris, Inc.*, 992 F.2d 244, 245 (10th Cir.1993). The first and third elements are conceded, and the record reflects that a Mr. Mason Short was hired for the position. Therefore, only the issue of Ms. Ratts' qualifications is contested. The Tenth Circuit has clearly identified the scope of this determination:

> At the prima facie stage, the court need only conclude that the plaintiff has shown through credible evidence, including her own testimony, that she was minimally qualified for the position she sought, even if the defendant disputes that evidence.... We will not allow [the defendant] to "short circuit" the *McDonnell Douglas* analysis by challenging [plaintiff's] qualifications at the prima facie stage.

*Bullington*, 186 F.3d at 1316, n. 11. According to the affidavit submitted by Ms. Ratts, her qualifications included over ten years administrative experience, including an alleged fourteen month stint as acting Airport Manager. The decision on who to replace Mr. Maier was ultimately made by the then acting City Manager, James Heinicke. In his deposition, Mr. Heinicke admits that Ms. Ratts "probably met the minimum qualifications." (James Heinicke Dep. at 57). Considering this evidence,

**14.** Plaintiffs argue that the recent Supreme Court case of *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), should alter the court's analysis. After reviewing the holding in *Reeves*, the court disagrees. While the case is significant for some circuits, *Reeves* does not mandate a departure from established Tenth Circuit precedent. The rule remains unchanged, if a plaintiff can establish a prima facie case and present evidence that the defendant's proffered reason is pretextual, then the plaintiff may survive summary judgment. See, e.g., *Adams v. Goodyear Tire & Rubber Co.*, No. 96–4228, 2000 WL 1859000, at *1 (D.Kan. Nov.9, 2000) (holding *Reeves* does not alter traditional Tenth Circuit precedent).

**15.** The prima facie burden may be slightly altered depending on the particular claim brought by a plaintiff. See *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254 n. 6, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (The prima facie "standard is not inflexible, as the facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not necessarily applicable in every respect in differing factual situations.") (internal citation and quotation marks omitted).

**16.** The Tenth Circuit has recently modified the prima facie requirements within the failure to hire/transfer context. See, e.g., *Amro v. Boeing Co.*, 232 F.3d 790, 797 (10th Cir.2000) (citing *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1225 (10th Cir.2000); *Perry v. Woodward*, 199 F.3d 1126, 1141 n. 13 (10th Cir.1999)). The modification affects the fourth element by removing the requirement that the job be filled by a non-protected individual. Now a plaintiff need only show that the job remained unfilled and that the employer was still seeking applicants. See *id.* Because the uncontroverted facts of this case satisfy the element as previously understood, the court recites the prior element for the parties' benefit.

the court finds that Ms. Ratts has sufficiently demonstrated her qualifications, and so, Ms. Ratts has met her burden of producing a prima facie case.

The City submits that Ms. Ratts' gender played no role in the decision not to hire her. Instead, Mr. Short was selected because of his superior qualifications. This proffered reason is sufficient to shift the burden back to Ms. Ratts.

■ To establish pretext, Ms. Ratts must show either that " 'a discriminatory reason more likely motivated the employer or . . . that the employer's proffered explanation is unworthy of credence.' " *Bullington*, 186 F.3d at 1317 (quoting *Burdine*, 450 U.S. at 256, 101 S.Ct. 1089) (alteration in original). Ms. Ratts may accomplish this by demonstrating " 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence.' " *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir.1997) (quoting *Olson v. General Elec. Astrospace*, 101 F.3d 947, 951–52 (3d Cir.1996)) (further internal citation omitted).

Ms. Ratts relies on her "ample" qualifications as proof that the City's proffered reason is pretextual. However, simply comparing her qualifications with the successful candidate is problematic, for an employer does not violate Title VII by choosing among qualified candidates, so long as the decision is not based on unlawful criteria. *See Burdine*, 450 U.S. at 259, 101 S.Ct. 1089. Additionally, without evidence that one candidate is overwhelmingly better qualified, pretext cannot be demonstrated by simply showing that the employer picked one candidate from a pool of equally qualified candidates. *See, e.g., Fallis v. Kerr–McGee Corp.*, 944 F.2d 743, 747 (10th Cir.1991) (holding that

mere disagreement with employer's evaluation of which geologists were best qualified, standing alone, could not support a finding of pretext); *Branson v.. Price River Coal Co.*, 853 F.2d 768, 772 (10th Cir.1988) ("As courts are not free to second-guess an employer's business judgment, this assertion [that plaintiff was equally or more qualified] is insufficient to support a finding of pretext."). Therefore, Ms. Ratts' assertion that she was qualified for the position does not establish pretext. The court has considered Ms. Ratts' other arguments regarding pretext and finds them lacking in merit, so the court finds that Ms. Ratts has failed to satisfy her burden under *McDonnell Douglas*. Therefore, summary judgment is appropriate on this issue.

### ● Transfer to the Library

■ Ms. Ratts is alleging that her transfer to the library represents unequal treatment based on her gender. To establish a prima facie case of disparate treatment in this context, Ms. Ratts must show: (1) she is a member of the class protected by the statute; (2) she suffered an adverse employment action; and (3) she was treated less favorably than others not in the protected class. *See Trujillo v. University of Colorado Health Sciences Ctr.*, 157 F.3d 1211, 1215 (10th Cir.1998). The first element is conceded. As for the second element, the City contends that Ms. Ratts' transfer to the library was not an adverse action because it represented a lateral move within the City's organization. In particular, the City notes that Ms. Ratts' salary was not affected by her transfer. The City's reliance on salary as the linchpin in determining what constitutes an adverse action is misplaced. *See Gunnell v. Utah Valley State College*, 152 F.3d 1253, 1264 (10th Cir.1998) (acknowledging that the Tenth Circuit liberally construes the phrase "adverse employment action").

The Tenth Circuit has opted for a "case-by-case approach" in determining what constitutes adverse action. *See Jeffries v. Kansas,* 147 F.3d 1220, 1232 (10th Cir. 1998). While a "mere inconvenience or an alteration of job responsibilities" does not rise to the level of adverse action, *Sanchez v. Denver Pub. Schs.,* 164 F.3d 527, 532 (10th Cir.1998), reassignment with a significant change in responsibilities may meet the threshold. *See Ellerth,* 524 U.S. at 761, 118 S.Ct. 2257. Because the transfer to the library radically altered Ms. Ratts' duties, i.e., administration and clerical work to manually shelving books, the court finds that the transfer was not an innocuous lateral transfer. This finding is also supported by the drop in prestige Ms. Ratts alleges was associated with her work as a book shelver. Ms. Ratts, therefore, has satisfied the second element of her prima facie case.

The court now turns to the final element of Ms. Ratts' prima facie case. To demonstrate that she was treated differently then her male counterparts, Ms. Ratts compares the treatment she received versus the treatment of Mr. Maier. In particular, Ms. Ratts alleges Mr. Maier was given his choice of positions when forced to transfer away from the airport, while Ms. Ratts was given no such opportunity. This disparity, she claims, was the product of gender discrimination. However, Ms. Ratts fails to sufficiently show how Mr. Maier and herself were similarly situated. Mr. Maier was in fact Ms. Ratts' supervisor, clearly they did not share a common position within the City. Comparing how an employer handled the transfer of a supervisor versus how the same employer handled the transfer of a subordinate obviates the "similarly situated" element embodied in the concept of disparate treatment. *See generally Aramburu v. Boeing Co.,* 112 F.3d 1398, 1403 (10th Cir.1997). Ms. Ratts has, therefore, failed to suffi-ciently establish the third element of her prima facie case, so the court finds summary judgment appropriate for this claim.

● **Retaliation**

Title VII makes it unlawful to retaliate against an employee for participating in certain protected activity. *See* 42 U.S.C. § 2000e–3(a). Once again, the *McDonnell Douglas* framework guides the court's analysis. *See McGarry v. Board of County Comm'rs,* 175 F.3d 1193, 1201 (10th Cir.1999). To establish a prima facie case of retaliation, Ms. Ratts must demonstrate that: (1) she engaged in protected opposition to discrimination; (2) she was subjected to adverse employment action; and (3) a causal connection existed between the protected activity and the adverse employment action. *See id.* (citing *Griffith v. Colorado,* 17 F.3d 1323 (10th Cir.1994)).

It is uncontested that Ms. Ratts' filing with the EEOC satisfies the first element. As for the second element, Ms. Ratts alleges six adverse actions were taken against her in retaliation: (1) she was transferred to the library; (2) the City refused to hire her for the Airport Manager position; (3) she received negative treatment by her co-workers; (4) she felt pressure to resign; (5) the City denied her a clothing allowance; and (6) the City denied her opportunities to interview for other employment. The court has already considered Ms. Ratts' transfer and found it to be an adverse employment action. It is also well settled that a failure to promote constitutes an adverse employment action in a Title VII retaliation claim. *See, e.g., Ellerth,* 524 U.S. at 761, 118 S.Ct. 2257 (listing failure to promote as a tangible employment action).

Co-worker retaliation presents an interesting question, for Title VII is designed only to implicate an employer's in-

tentional discrimination. The court must undertake a two-step analysis. First, the court must determine if the alleged acts are sufficiently severe to amount to adverse employment action. *See Gunnell,* 152 F.3d at 1265. If the acts are sufficiently severe, the court will then consider the employer's liability. *See id.* ("[A]n employer can only be liable for co-workers' retaliatory harassment where its supervisory or management personnel either (1) orchestrate the harassment or (2) know about the harassment and acquiesce in it in such a manner as to condone and encourage the co-workers' actions."). The City admits that its management issued a "gag order," which forbade airport personnel from discussing the complaint filed against Mr. Maier by Ms. Ratts. Ms. Ratts contends that her co-workers became unresponsive to her regarding all matters, not just the complaint. Additionally, she alleges that several of her co-workers began to "spy" on her. After viewing the evidence in the light most favorable to Ms. Ratts, the court concludes that these actions are not sufficiently severe to constitute adverse employment action for the purposes of the retaliation claim. *See id.* With this finding established, there is no need to consider the City's liability.

■ The court has also considered Ms. Ratts' fourth, fifth, and sixth instances of alleged adverse action. After proper review, the court finds that they too are insufficiently severe to constitute adverse employment action. Therefore, as the court turns to the third element of the prima facie case, causation, only Ms. Ratts' transfer and denial of promotion will be considered as adverse employment action.

■ A causal connection may be shown by producing "evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely fol-

lowed by adverse action." *Burrus v. United Tel. Co. of Kansas, Inc.,* 683 F.2d 339, 343 (10th Cir.1982). *See also Candelaria v. EG & G Energy Measurements, Inc.,* 33 F.3d 1259, 1261–62 (10th Cir.1994). The burden is to produce evidence demonstrating that the employer took the adverse action in an effort to retaliate. *See Bullington,* 186 F.3d at 1320–21 (citing *Randlett v. Shalala,* 118 F.3d 857, 862 (1st Cir.1997) ("[T]he adverse action must have been taken for the purpose of retaliating.")). While plaintiffs routinely offer temporal proximity as evidence of retaliation, this avenue is by no means the exclusive option when attempting to show a retaliatory motive. *See, e.g., Kneibert v. Thomson Newspapers, Michigan, Inc.,* 129 F.3d 444, 455–56 (8th Cir.1997) (concluding plaintiff presented genuine issue of material fact where statements by employee involved in decision-making process revealed retaliatory motive).

Ms. Ratts filed her charge with the EEOC on October 18, 1996. She was transferred to the library on May 19, 1997, so a time-span of approximately seven months separated the two events. Although the record is unclear as to the exact date Ms. Ratts was denied the job of Airport Manager, the parties make clear that this event occurred after Ms. Ratts' transfer. Hence, the court considers the seven month span to be the most accurate description of the temporal proximity between Ms. Ratts' protected conduct and adverse employment action. Such a length of time is insufficient, standing alone, to establish an inference of causation. *Conner v. Schnuck Markets, Inc.,* 121 F.3d 1390, 1395 (10th Cir.1997) ("the four month time lag between [plaintiff's] participation in protected activity and his termination by itself would not be sufficient to justify an inference of causation"). *See also Richmond v. ONEOK, Inc.,* 120

F.3d 205, 209 (10th Cir.1997) (holding that a three month period is insufficient, by itself, to establish causation). *Cf. Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1234 (10th Cir.2000) (holding plaintiff failed to establish a causal connection between his participation in protected activity and discharge because "the complaints were remote in time"). Ms. Ratts, therefore, must produce additional evidence to establish causation. *See Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir.1999) (citing *Conner*, 121 F.3d at 1395).

Ms. Ratts offers the statements of Mr. Heinicke, the individual who decided to transfer her, as evidence of the casual connection between her protected activity and her adverse employment action. This analysis is highly related to the question of pretext, and the court acknowledges that its discussions may overlap. In his deposition, Mr. Heinicke was asked why he transferred Ms. Ratts to the library. He stated: "the reason I moved her from the airport, . . . is, number one, to address the perceived safety issue. Number two is the morale. And number three, we needed help at the library running the operation." (James Heinicke Dep. at 50). The court will leave the "safety issue" for the time being and focus on the library's personnel issue and the airport's morale problem.

In his memorandum advising Ms. Ratts of her transfer, Mr. Heinicke makes clear that she is on "temporary loan" to the library "to assist them with clerical duties while they are in the process of converting to a new recordkeeping system." (Pls.' Ex. 9). Ms. Ratts was never brought back to the airport. In his deposition, Mr. Heinicke is questioned regarding why Ms. Ratts is still at the library:

Question: So [Ms. Ratts] is then, quote/unquote, temporarily reassigned to the library until the Court or the jury in this case makes a decision on the validity of her allegation. Is that what you're telling us?

Answer: I don't know that that's the only scenario under which that would occur, there may be other unforseen things that I don't—

Question: Can you conceive of any other scenario?

Answer: Well, at this point whatever the eventual outcome of this process would be would help advise me on what—what to do next.

(James Heinicke Dep. at 42). Ms. Ratts alleges that Mr. Heinicke's "wait and see" policy regarding her allegations of sexual harassment lend credence to the assertion that her transfer was caused by her filing with the EEOC. The question is posed, if Ms. Ratts was transferred for reasons beyond her filing, then why is her return premised on the outcome of her allegations contained within the filing?

Ms. Ratts also directs the court to Mr. Heinicke's testimony regarding the alleged morale problem at the airport. He testified as follows:

Question: Did you have any occasion at all that prior to [Ms. Ratts'] sexual harassment complaint that there was any controversy or morale problem among the employees at the airport?

Answer: No.

Question: Mr. Kloster didn't tell you that there was, did he?

Answer: No.

(James Heinicke Dep. at 57). Mr. Heinicke also admitted that the supposed morale problems were not solely created by Ms. Ratts. (James Heinicke Dep. at 52). Once again, Ms. Ratts argues that a cause and effect relationship existed between her protected activity and her transfer. Viewed in a light most favorable to Ms. Ratts, the court finds a reasonable jury

could conclude that a causal connection existed between her protected activity and adverse employment action. Hence, Ms. Ratts has successfully demonstrated a prima facie case. The court now turns to the second and third phase of the *McDonnell Douglas* framework.

▇▇▇ The court finds that the City has sufficiently proffered three non-discriminatory justifications for taking adverse action against Ms. Ratts, i.e., the library's personnel needs, the airport's morale problem, and Ms. Ratts' safety concerns. Ms. Ratts must now demonstrate that these justifications are merely pretextual. As indicated above, one of Mr. Heinicke's justifications concerned Ms. Ratts' "safety issue." This issue involved Ms. Ratts' complaints that a certain individual named Danny Kearns was stalking her. It appears from the record that Mr. Kearns, while not an employee of the airport, was regularly present at the facility. Mr. Heinicke testified that he transferred Ms. Ratts so she could be in a safer environment. However, Mr. Heinicke admits that he had no information regarding Mr. Kearns beyond what Ms. Ratts had told him. Ms. Ratts argues, that instead of taking steps to investigate Mr. Kearns or provide a more secure working environment, Mr. Heinicke transferred her because "the library is a safer environment. There's always people around, you're not alone at the library." (James Heinicke Dep. at 51). Mr. Heinicke testified, however, that Ms. Ratts did not wish to be transferred and, in fact, desired to return to the airport. There was no investigation into whether Ms. Ratts was indeed safer at the library. Granting Ms. Ratts all possible inferences, the court finds serious inconsistencies within this justification.

As to the personnel and morale justifications, the court finds Ms. Ratts has demonstrated sufficient inconsistencies as to present an issue of fact as to whether her adverse employment actions were retaliatory in nature. Therefore, the court will not grant summary judgment on this claim.

● **Section 1983**

Independent from her Title VII claims, Ms. Ratts asserts claims, pursuant to 42 U.S.C. § 1983, against all of the defendants. Claims brought under § 1983 provide a cause of action against individuals who, acting under the color of state law, violate a person's constitutional rights. *See* 42 U.S.C. § 1983. Due to the statute's inclusive nature, a prospective plaintiff may levy a multitude of claims under § 1983 in any given case. Unfortunately, the present parties, most specifically plaintiffs, have presented the court with a wide array of arguments and authority apparently blending several distinct claims under general constitutional terminology. The court, therefore, will attempt to properly delineate these claims and address each in turn.

● **Equal Protection–Sexual Harassment**

It is well established that sexual harassment can result in a violation of a person's Fourteenth Amendment right to equal protection of the law. *See Starrett v. Wadley,* 876 F.2d 808, 814 (10th Cir.1989). The standard to determine actionable sexual harassment in a § 1983 claim follows a similar vein as the standard employed in a Title VII claim. *See, e.g., Southard v. Texas Bd. of Criminal Justice,* 114 F.3d 539, 554 (5th Cir.1997); *Randle v. City of Aurora,* 69 F.3d 441, 450–51 (10th Cir. 1995); *Trautvetter v. Quick,* 916 F.2d 1140, 1149 (7th Cir.1990). *Cf. Redpath v. City of Overland Park,* 857 F.Supp. 1448, 1458 (D.Kan.1994) ("The ultimate issue in any case alleging a violation of the Equal Protection Clause is whether plaintiffs can prove intentional discrimination."). To be liable under § 1983, however, a defendant

must have violated said right while acting under the color of state law. In the employment context, "in order to establish the state action necessary to support a § 1983 claim, [each individual defendant] had to be [Ms. Ratts'] supervisor or in some other way exercise state authority over her." *Noland v. McAdoo*, 39 F.3d 269, 271 (10th Cir.1994). With this standard established, the court will now address the standard's application to each defendant.[17]

### • Robert Maier

■ The court must first consider the issue of the timeliness of plaintiffs' claim against defendant Maier. As the court previously discussed, the continuing course of conduct doctrine operates in the Title VII context. Most courts, however, have severely questioned the doctrine's applicability within a § 1983 claim. *See Thomas v. Denny's, Inc.*, 111 F.3d 1506, 1514 (10th Cir.1997) ("[T]he continuing violation theory is a creature of the need to file administrative charges, and because [this type of] claim does not require filing such charges before a judicial action may be brought, the continuing violation theory is simply not applicable.") (considering an analogous claim pursuant to 42 U.S.C. § 1981); *Holmes v. Regents of the Univ. of Colorado*, 1999 WL 285826, No. 98–1172, at *3, n. 2 (10th Cir. May 7, 1999) (noting that the Tenth Circuit has never specifically held whether the doctrine applies to § 1983 claims); *Houck v. City of Prairie Village*, 924 F.Supp. 120, 121–22 (D.Kan.1996) (noting reluctance to use continuing violation doctrine in a § 1983 claim). Plaintiffs offer no authority for the doctrine's applica-

tion, so the court will not apply it in this context.

■ In a § 1983 action filed in Kansas, the relevant statute of limitations is two years. *See Baker v. Board of Regents*, 991 F.2d 628, 630 (10th Cir.1993); Kan.Stat. Ann. § 60–513(a)(4). This case was filed on December 10, 1997. Consequently, the court will only consider those acts occurring after December 10, 1995, in assessing whether plaintiffs present a viable claim of sexual harassment under § 1983.

In his motion for summary judgment, Mr. Maier identifies only three instances of alleged sexual harassment that could have occurred on or after December 10, 1995:(1) Mr. Maier placing his aroused groin against Ms. Ratts; (2) Mr. Maier telling Ms. Ratts that he wished "to find her little box under his Christmas tree;" and (3) Mr. Maier's assertion to Ms. Ratts that he "wanted to get hold of her and rape her" and that she should "just take it." Mr. Maier argues that these incidents are neither severe enough or sufficiently pervasive enough in nature to amount to actionable sexual harassment.

In response to Mr. Maier's nine to ten pages of argument and recitation of authority, plaintiffs submit the following single paragraph:

> Unlike gender discrimination claims, courts have distinguished sexual harassment claims under Title VII and § 1983. *See Redpath v. City of Overland Park*, 857 F.Supp. 1448, 1461–62 (D.Kan.1994). Section 1983 claims focus on whether the discrimination was ·intentional. *Id.* (Intentional discrimination cannot be shown by one dirty joke, consensual hugging between co-workers, and gener-

---

17. It is clear from the pleading that the individual defendants are sued under § 1983 in their individual capacities. *See, e.g., Pride v. Does*, 997 F.2d 712, 715 (10th Cir.1993). To the extent that they are sued in their official capacities, those claims merely duplicate the claims brought directly against the City. *See Russ v. Uppah*, 972 F.2d 300, 303 (10th Cir. 1992).

al vulgar language and gestures.) Whatever standard ultimately emerges for § 1983 claims of sexual harassment, the conduct complained of by plaintiff rises to the level of "intentional discrimination."

(Pls.' Mem. at 65). The above paragraph strikes a familiar cord with the court—considering that most of it is the court's own language directly quoted from one of it's earlier opinions. *See Wood v. City of Topeka,* 90 F.Supp.2d 1173, 1188 (D.Kan. 2000). Absolutely no reference or citation accompanies this paragraph.[18] The court is regrettably aware of the modern trend in which lawyers usurp or assume other's work or ideas within their pleadings. However, attempting to pass off *this* court's own language as its own in a presentation to this very court demonstrates on the part of plaintiffs' counsel inexcusable carelessness bordering on outright disrespect for the court's integrity and attention to detail. The court would remind counsel that it strongly disapproves of this practice and encourages counsel to learn the established rules for legal citation. *See generally* The Bluebook: A Uniform System of Citation (Columbia Law Review Ass'n et al. eds., 17th ed.2000).

In any event, the court is baffled as to how plaintiffs believe quoting a passage describing the § 1983 standard remotely meets its burden in opposing a properly presented motion for summary judgment. Plaintiffs do not controvert the issue of timeliness or what acts may or may not fall within the appropriate time-span. Plaintiffs do not present any argument advancing how these events represent actionable sexual harassment within a § 1983 claim. Plaintiffs do not argue that Mr. Maier acted under the color of state law. Plaintiffs do not even take the time to type the words "Mr. Maier" within their argument section of their motion to oppose Mr. Maier's request for summary judgment. If the court were to allow a § 1983 claim to proceed completely rested upon a Title VII claim, then the claims would lose all sense of their individuality and become for all intensive purposes a single claim.[19] The court has no choice but to consider this claim abandoned by plaintiffs. *See, e.g., Edwards & Assocs., Inc. v. Black & Veatch, L.L.P.,* 84 F.Supp.2d 1182, 1197 (D.Kan.2000) (finding fraud claim abandoned where plaintiff failed to respond to defendant's arguments); *Adams v. Goodyear Tire & Rubber,* No. 96–4228, 2000 WL 1310521, at *2, n. 2 (D.Kan. Aug.25, 2000). *See also Adler v. Wal–Mart Stores, Inc.,* 144 F.3d 664, 672 (10th Cir.1998) (noting that in the absence of legal argument and authority, the court is hesitant "of becoming advocates who comb the record of previously available evidence and make a party's case for it"). Summary judgment is appropriate as to this claim.

● **Robert Myers, Donald Horst, James Heinicke, and Ron Ahsmuhs**

The court is perplexed as to why plaintiffs assert their § 1983 claim against these individual defendants. No where in the record before the court is it sufficiently

---

**18.** The paragraph contains a significant error as quoted by plaintiffs. By enclosing the sentence, "Intentional discrimination cannot be ..." within parentheses, plaintiffs create what appears to be a parenthetical reference to the *Redpath* opinion. However, as it appears in the original, the sentence is the court's own language commenting on the facts of the case before the court. Whether done intentionally or out of carelessness, such an error dramatically impacts the import of the sentence. The court would urge plaintiffs' counsel to insure that their papers to the court are technically correct.

**19.** The court would note that plaintiffs do not even make the effort to reference their earlier analysis under Title VII. The court will not seek out or create arguments for plaintiffs.

alleged any acts of sexual harassment perpetrated by Messrs. Myers, Horst, Heinicke, or Ahsmuhs. The court finds summary judgment appropriate to these defendants.

### • City and County

 Municipalities, such as Newton, are considered "persons" to whom § 1983 liability applies. *See Monell v. Department of Social Servs.*, 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). In *Monell*, the Supreme Court held "it is when execution of a government's policy or custom ... inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694, 98 S.Ct. 2018.

The Supreme Court has held that a municipal policy may include not only policy statements, ordinances, and regulations but the individual decisions of city officials who have "final policymaking authority." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) (plurality opinion). *See Lankford v. City of Hobart*, 73 F.3d 283, 286 (10th Cir.1996) ("In order to warrant liability, a municipal policy must be a 'policy statement, ordinance, regulation, or decision officially adopted and promulgated by [a municipality's] officers.' ") (quoting *Starrett*, 876 F.2d at 818) (alteration in original) (further internal citation omitted).

In the present case, although the City may have failed to create and disseminate a sexual harassment policy, there is no indication from the record that the City had an affirmative policy favoring or even acquiescing to sexual harassment. Additionally, plaintiffs do not argue that Mr. Maier was empowered with "final policymaking authority." As such, the court finds that the City did not have a "policy," which resulted in Ms. Ratts' alleged deprivation.

The City may still be held liable for Ms. Ratts' alleged deprivation if the practice of harassment was considered a municipal custom. Municipal customs have been defined as " 'persistent and widespread ... practices of [city] officials.' " *Monell*, 436 U.S. at 691, 98 S.Ct. 2018 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167–68, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). However, plaintiffs offer absolutely no argument for why there existed a widespread practice of harassment throughout the City. The court will not fabricate argument for plaintiffs' claim. In light of plaintiffs' failure to pursue this issue and considering the record in this case is chiefly preoccupied with the actions of Mr. Maier only, the court finds insufficient evidence demonstrating that the City[20] had a custom of sexual harassment. As such, the court finds summary judgment appropriate on this claim.[21]

### • Equal Protection–Gender Discrimination

Ms. Ratts completely predicates her § 1983 claim of gender discrimination upon her rights under Title VII. (Pls.' Mem. at 65). Therefore, because the court found that defendants did not violate these rights, Ms. Ratts' § 1983 claim also must

---

**20.** Absolutely no reference is made by plaintiffs that would lend any support for attaching liability to the County. No "policy or custom" is remotely advanced by plaintiffs. Summary judgment is appropriate as to the County.

**21.** In the Pretrial Order (Doc. 213), plaintiffs appear to also assert a failure to train argu-

ment against the City. Once again, however, plaintiffs' memorandum in opposition to the motions for summary judgment is completely devoid of any argument or authority supporting this claim. In light of plaintiffs' refusal to effectively present this argument, the court finds the claim abandoned and ripe for summary judgment.

fail. Summary judgment is appropriate as to all defendants.

### ● First Amendment–Free Speech

 Plaintiffs assert defendants took adverse employment action against Ms. Ratts in retaliation for certain statements made by Ms. Ratts. It is well established that a "public employer may not condition employment or its incidents upon an employee's relinquishment of his or her First Amendment rights." *Woodward v. City of Worland,* 977 F.2d 1392, 1403 (10th Cir. 1992) (citing *Pickering v. Board of Educ.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)).

The Tenth Circuit has clearly elucidated the standard the court must employ in considering Ms. Ratts' claim:

> In a First Amendment action against a public employer alleging retribution for speech, the court must first determine whether the employee's speech was on a matter of public concern. If the speech involved a matter of public concern, the court must then balance the interests of the employee, as a citizen, in commenting upon matters of public concern, and the interests of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.

*Id.* (internal citations and quotations omitted). If the balancing inquiry "tips in favor of the employee, the employee must then show that the speech was a 'substantial or motivating factor in the detrimental employment decision.'" *Dill v. City of Edmond,* 155 F.3d 1193, 1201–02 (10th Cir. 1998) (quoting *Gardetto v. Mason,* 100 F.3d 803, 811 (10th Cir.1996)). Finally, if the speech was indeed a factor, "the employer may demonstrate that it would have taken the same action against the employee even in the absence of the protected speech." *Id.* at 1202. The court now turns to the "public concern" issue, which is undoubtedly the linchpin of this inquiry.

The case of *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) is the seminal Supreme Court case on determining what is or is not a matter of public concern. In *Connick,* the Court differentiated between speech concerning a governmental agency's "discharg[e][of] its governmental responsibilities," which is speech on a matter of public concern, from speech concerning internal personnel disputes or working conditions, which does not implicate a public concern. *Id.* at 148, 103 S.Ct. 1684. *See also Woodward,* 977 F.2d at 1403 (citing *Connick,* 461 U.S. at 148, 103 S.Ct. 1684). In pursuit of this determination, the court must consider the "content, form, and context of a given statement, as revealed by the whole record." *Connick,* 461 U.S. at 147–48, 103 S.Ct. 1684.

After reviewing the entire record in the present case, the court finds that Ms. Ratts' statements were of a personal nature not constituting speech of public concern. The Pretrial Order, states: "Cindy Ratts engaged in First Amendment Free Speech Rights on matters of public concern including sexual harassment by her supervisor who occupied a position of public trust and concern, complaining and warning about tampering with the aircraft owned by the plaintiffs, and the defendant Maier buzzing her house in an airplane." (Doc. 213 at 7). As for the statements concerning sexual harassment, in *David v. City and County of Denver,* 101 F.3d 1344, (10th Cir.1996), the Tenth Circuit, while addressing a similar factual scenario, held that an employee's complaints of sexual harassment were of a personal nature and did not involve a matter of public concern. The Tenth Circuit stated:

> Officer David's complaints and letter alleged that she has been personally sub-

jected to sexual harassment, retaliation, and unwarranted disciplinary action. Her allegations focus on the conditions of her own employment, and in neither the EEOC complaints nor the letter to the City Attorney does Officer David allege that other employees have been subjected to harassment or retaliation or that the harassment and retaliation has interfered with the Department's performance of its governmental responsibilities. Therefore, Officer David's statements do not involve matters of public concern under the *Connick* standard.

*David,* 101 F.3d at 1356. *See also Woodward,* 977 F.2d at 1404 ("we are aware of no case holding that speech similar to that made by Plaintiffs pertained to a matter of public concern").

In the present case, the speech in question was ostensibly focused on addressing Ms. Ratts' personal desire to have the harassment cease. Additionally, no where in the record is it sufficiently alleged that Ms. Ratts spoke out because Mr. Maier's conduct was interfering with the governmental agency's operation.

In their opposition memorandum, plaintiffs attempt to couch Ms. Ratts' complaints within the public concern standard by stating "Plaintiffs spoke out regarding Maier's sexual conduct and his placement as a fireman in a position of public trust where he comes into contact with female citizens." (Pls.' Mem. at 67). While the court notes the creative attempt to drum up a matter of public concern, i.e., the welfare of other female employees, the court is unconvinced that the record in this case supports such an exercise. The intent of Ms. Ratts' complaints were grounded firmly, if not solely, on her personal grievances. *See Workman v. Jordan,* 32 F.3d 475, 483 (10th Cir.1994), *cert. denied,* 514 U.S. 1015, 115 S.Ct. 1357, 131 L.Ed.2d 215 (1995) ("The court will also consider the motive of the speaker to learn if the speech was calculated to redress personal grievances or to address a broader public purpose.").

As for the other two topics of Ms. Ratts' complaints/statements—both are unquestionably personal in nature. One topic concerns personal property owned by plaintiffs, and the other topic regards alleged action occurring at plaintiffs' own home. While a personal grievance may concern a matter of public concern *if* it "addresses important constitutional rights which society at large has an interest in protecting," the present issues fail to satisfy this limited exception. *Woodward,* 977 F.2d at 1404 (citing *Connick,* 461 U.S. at 149, 103 S.Ct. 1684). Having found that none of Ms. Ratts' complaints or statements involved matters of public concern, the court will not continue its analysis. Summary judgment is appropriate on this issue as to all defendants.

● **Fifth and Fourteenth Amendment–Property Right**

Plaintiffs allege in the Pretrial Order that "Cindy Ratts had a property right in her job and was deprived of that right by defendants." (Doc. 213 at 7). Defendants submit they are entitled to summary judgment on this issue. (Defs.' Mem. at 53–54). In their response, however, plaintiffs make absolutely no mention of this claim, and the court is convinced that plaintiffs' inaction constitutes abandonment. Therefore, summary judgment will be granted as to this issue.

● **Disability Discrimination**

▆▆▆▆ When considering a claim brought under the ADA, the court is once again guided by the *McDonnell Douglas* analytical framework. *See Williams v. Widnall,* 79 F.3d 1003, 1005 & n. 3 (10th Cir.1996) (explaining application of the analysis in cases under the ADA). The

ADA prohibits a covered entity[22] from discriminating against a "qualified individual with a disability" because of the individual's disability with respect to terms, conditions, and privileges of employment. 42 U.S.C. § 12112(a). A "qualified individual with a disability" is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). *See, e.g., Sutton v. United Air Lines, Inc.*, 130 F.3d 893, 897 (10th Cir.1997); *Milton v. Scrivner, Inc.*, 53 F.3d 1118, 1123 (10th Cir.1995).

To state a prima facie case of discrimination under the ADA, a plaintiff must demonstrate: (1) she is a disabled person within the meaning of the ADA; (2) she is qualified, that is, she is able to perform the essential functions of the job, with or without reasonable accommodation; and (3) she suffered adverse employment action because of her disability. *See Doyal v. Oklahoma Heart, Inc.*, 213 F.3d 492, 495 (10th Cir.2000); *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir.1997). The court now turns to the issue of whether Ms. Ratts is disabled for purposes of the ADA.

Under the ADA, a person is considered to have a disability if that individual either (A) has a physical or mental impairment that substantially limits one or more of the major life activities of such individual, (B) has a record of such an impairment, or (C) is regarded by the employer as having such an impairment. 42 U.S.C.

§ 12102(2). Ms. Ratts claims she is disabled because she suffers from both mental and physical impairments, which substantially limit several major life activities.

There exists a three-step process for determining whether a plaintiff has a disability under the first subsection of the ADA's disability definition. *See Bragdon v. Abbott*, 524 U.S. 624, 631–41, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998). First, the court must determine if plaintiff suffers from a physical or mental impairment. *Id.* Second, the court will identify those life activities affected by the impairment and determine whether they are "major" life activities[23] under the ADA. *Id.* Third, the court determines whether plaintiff's impairment "substantially limits" the major life activities identified in step two. *Id.*

The court will consider Ms. Ratts' alleged impairments independently. First, Ms. Ratts claims to suffer from depression and/or anxiety. She claims this impairment affects her life activities of learning, sleeping, and "mental tasks." However, even assuming, without deciding, that these allegations are sufficient to satisfy the first two steps under *Bragdon,* the court finds Ms. Ratts has failed to satisfy the third phase of this inquiry by not presenting sufficient evidence demonstrating that her depression substantially limits any of her proffered life activities.

The EEOC's regulations implementing the ADA define the term "substantially limits" to mean:

---

**22.** The ADA defines "covered entity" as meaning "an employer, employment agency, labor organization, or joint labor-management committee." 42 U.S.C. § 12111(2). Once again, although plaintiffs bring this claim against both the City and County, the court has previously concluded that Ms. Ratts was an employee of the City only, so the court finds summary judgment appropriate as to the County.

**23.** Major life activities include caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, working, sitting, standing, lifting, and reaching. *See* 29 C.F.R. Pt. 1630, App. 1630.2(i). *See also Lowe v. Angelo's Italian Foods, Inc.*, 87 F.3d 1170, 1173 (10th Cir.1996) (identifying working and lifting as major life activities under the ADA).

(i) Unable to perform a major life activity that the average person in the general population can perform; or

(ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1).

As to the life activity of sleeping, Ms. Ratts' only evidence is her own statements describing her occasional "trouble" with sleeping. She offers no evidence discussing the nature, severity, duration, or impact of her sleeping limitation.[24] The record as presented is wholly insufficient to satisfy the "substantially limited" threshold. *See Doyal,* 213 F.3d at 498 (holding occasional insomnia insufficient to show plaintiff was substantially limited in the activity of sleeping).

As to the life activity of learning, Ms. Ratts has presented no instances where she encountered difficulty in learning. She does present her own testimony regarding a sporadic difficulty in concentration, yet again, no specific instances or evidence is offered demonstrating the nature, severity, duration, or impact of her learning limitation. Nor does Ms. Ratts show how her ability to concentrate is significantly reduced when compared to the average person. Hence, the court finds that Ms. Ratts has failed to properly show she was substantially limited in her ability to learn. *See id.* (holding plaintiff who did not present instances where she had difficulty learning failed to demonstrate that her ability to learn was substantially limited).

The court will now apply the same standards in considering Ms. Ratts' physical impairment. Ms. Ratts apparently claims to suffer from carpal tunnel syndrome. She alleges this impairment substantially limits her ability to stand, lift, and reach. Again, assuming, without deciding, that these allegations are sufficient for the first two phases under *Bragdon,* the court finds that Ms. Ratts has failed the final phase of the inquiry. The evidence Ms. Ratts offers regarding her physical disability consists of several notes drafted by her treating physicians. In one note, the doctor apparently diagnoses Ms. Ratts with carpal tunnel and suggests she wear wrist splints or cease doing the repetitive activity of shelving books. (Pls.' Ex. 25). The evidence proffered by Ms. Ratts is, however, wholly devoid of any mention of Ms. Ratts' ability to stand or reach. As for lifting, Ms. Ratts has failed to produce evidence comparing her ability to lift as compared to an average person. She offers no evidence discussing the nature, severity, duration, or impact of her lifting limitation. In fact, Ms. Ratts offers no indication that she even has a lifting restriction. The only restriction placed on her by her doctors involved reducing the number of hours per day she shelved books. (Pls.' Ex. 25). In light of this deficiency of evidence, the court is convinced Ms. Ratts has failed to properly demonstrate that her physical impairment substantially limits any of her espoused life activities. *See Riggs v. Boeing Co.,* 98 F.Supp.2d 1252, 1259–60 (D.Kan.2000) (finding plaintiff who did not present evi-

---

**24.** The EEOC regulations recommend that the following factors be considered in determining whether an individual is substantially limited in a major life activity: "(i) the nature and severity of the impairment; (ii) the dura-

tion or expected duration of the impairment; and (iii) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." 29 C.F.R. § 1630.2(j)(2).

dence concerning the duration, severity, or impact of her carpal tunnel nor compared her ability to lift to that of an average person, failed to show her carpal tunnel substantially limited her ability to lift). *Cf. Lowe v. Angelo's Italian Foods, Inc.,* 87 F.3d 1170, 1174 (10th Cir.1996) (holding plaintiff who had multiple sclerosis and a fifteen pound lifting restriction had presented sufficient evidence even though she had not compared her lifting ability to that of an average person). Because Ms. Ratts cannot show that her mental or physical impairments substantially limit any of her major life activities, she has failed to demonstrate that she has a disability within the meaning of the ADA. Therefore, Ms. Ratts has failed to establish a prima facie case, and the court will grant summary judgment on this claim.

● **State Claims**

● **Notice and Jurisdiction**

In exercising its jurisdiction over plaintiffs' pendent state law claims, the court must be cautious in insuring that plaintiffs' claims are properly before the court. The City claims Mr. Ratts' state law claims are barred because Mr. Ratts failed to comply with the notice requirement embodied in Kan. Stat. Ann. § 12–105b(d). Under the statute, any person having a tort claim against a municipality must file a written notice before commencing an action against the municipality. Plaintiffs do not controvert that while the complaint in this matter was filed on December 10, 1997, Mr. Ratts did not file his notice with the City until December 13, 1997. The notice requirement in Kan. Stat. Ann. § 12–105b(d) is a mandatory prerequisite for bring a tort claim against a municipality under Kansas law. *See* Kan. Stat. Ann. § 12–105b(d) ("Any person having a claim against a municipality which could give rise to an action brought under the Kansas tort claims act *shall* file

a written notice . . . .") (emphasis added). *See also Bash v. City of Galena, Kansas,* 42 F.Supp.2d 1171, 1185–86 (D.Kan.1999) (dismissing pendent state law claim for failing to serve proper notice on a city defendant) (citing *Tucking v. Board of Comm'rs,* 14 Kan.App.2d 442, 796 P.2d 1055, 1057–58 (1990)). Mr. Ratts' failure to comply with state law is fatal to his claims. Therefore, the court finds summary judgment appropriate for all of Mr. Ratts' state law claims brought against the City.

● **Conspiracy to Interfere with Livelihood**

In its original motion for summary judgment, defendants interpreted this claim as one for tortious interference with a business relationship. However, plaintiffs state in their response that defendants have misconstrued their claim, and in reality plaintiffs claim "defendants intentionally conspired with each other to deprive Cindy Ratts of her job, promotions, and benefits. These tangible denials linked to her job with the City had [sic] adverse impact upon [RTR Corporation]." (Pls.' Mem. at 69). Defendants' confusion regarding the essence of this claim is understandable, for the court is also perplexed as to what plaintiffs are actually asserting. In any event, the court will not go plodding through the reams of submitted facts in this case in a crusade bent at creating or delineating some vaporous claim for plaintiffs. If this claim is asserting a claim on behalf of RTR Corporation, then such claim has previously been dismissed by the court. *See* February 28, 2000, Order (Doc. 206). As for the "interference of livelihood" claim, plaintiffs offer no authority for the standards outlining such a claim, and, in fact, as defendants hypothecate, the court questions the availability of such a claim under Kansas law. For these rea-

sons, the court finds summary judgment appropriate as to this claim.

- **Intentional Infliction of Emotional Distress**

Plaintiffs assert claims of intentional infliction of emotional distress ("IIED")[25] against the defendants. Plaintiffs, however, fail to properly identify which defendant(s) the claim is being asserted against. A review of plaintiffs' papers on this issue reveals all argument to be solely focused on the actions and conduct of Mr. Maier. Any claims intended to be asserted against the remaining defendants are considered abandoned by plaintiffs and summary judgment is granted. Therefore, the court will proceed with the understanding that the IIED claims are only asserted as to defendant Maier.

As a preliminary matter, the court notes that this claim is controlled by the two-year statute of limitations imposed by Kan. Stat. Ann. § 60–513(a)(4). *See, e.g., Desmarteau v. City of Wichita,* 64 F.Supp.2d 1067, 1083 (D.Kan.1999); *Maus v. Belger Cartage Serv., Inc.,* No. 96–1257, 1996 WL 748056, at *3 (D.Kan. Dec.27, 1996). Therefore, only those incidents occurring after December 10, 1995, may be considered by the court. Once again, plaintiffs offer no accounting as to which incidents, if any, fall within the appropriate time-span. On the other hand, Mr. Maier proffers the same three incidents that he submitted under plaintiffs' § 1983 claim: (1) Mr. Maier placing his aroused groin against Ms. Ratts; (2) Mr. Maier telling Ms. Ratts that he wished "to find her little box under his Christmas tree;" and (3) Mr. Maier's assertion to Ms. Ratts that he "wanted to get hold of her and rape her" and that she should "just take it." The court's consideration is therefore limited to the question of whether these three incidents are suffi-

cient for the claim to survive summary judgment.

The court has had an opportunity to detail the appropriate standard for IIED in Kansas. In *White v. Midwest Office Tech., Inc.,* the court stated:

To establish a claim of intentional infliction of emotional distress, commonly referred to as the tort of outrage, a plaintiff must demonstrate four elements: (1) the conduct of defendant must be intentional or in reckless disregard of plaintiff; (2) the conduct must be extreme and outrageous; (3) there must be a causal connection between defendant's conduct and plaintiff's mental distress; and (4) plaintiff's mental distress must be extreme and severe. *Moore v. State Bank of Burden,* 240 Kan. 382, 729 P.2d 1205, 1211 (1986) (citing *Hoard v. Shawnee Mission Medical Center,* 233 Kan. 267, 662 P.2d 1214 (1983)). For plaintiff's claim to survive summary judgment, the court must, as a matter of law, first determine that reasonable fact finders might differ as to: (1) whether defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, and (2) whether plaintiff's emotional distress was so extreme and severe that the law must intervene because no reasonable person should be expected to endure it. *Id.* (citing *Roberts v. Saylor,* 230 Kan. 289, 637 P.2d 1175, 1179 (1981)). Conduct is not extreme and outrageous unless it is regarded as being "beyond the bounds of decency and utterly intolerable in a civilized society ." *Id.* The threshold requirements for outrage causes of action are "necessarily high to separate meritorious claims from those based on trivialities or hyperbole." *Rupp v. Purolator*

---

**25.** The nomenclature of IIED and the "tort of outrage" are synonymous under Kansas law.

*See Taiwo v. Vu,* 249 Kan. 585, 822 P.2d 1024 (1991).

*Courier Corp.,* 790 F.Supp. 1069, 1073 (D.Kan.1992) (citing *Fletcher v. Wesley Medical Center,* 585 F.Supp. 1260, 1261–62 (D.Kan.1984)).

▇▇▇ Intentional infliction of emotional distress "is not a favored cause of action under Kansas law." *Beam v. Concord Hospitality, Inc.,* 873 F.Supp. 491, 501 (D.Kan.1994) (quoting *E.E.O.C. v. General Motors Corp.,* 713 F.Supp. 1394, 1396–97 (D.Kan.1989)). "The Kansas courts have been reluctant to extend the outrage cause of action to discrimination claims, including claims of sexual harassment, arising in the employment setting." *Id.* (quoting *Laughinghouse v. Risser,* 754 F.Supp. 836, 843 (D.Kan.1990)). The existence of a hostile work environment sufficient to support a Title VII claim does not necessarily require a finding of outrageous conduct. *See, e.g., Varley v. Superior Chevrolet Automotive Co.,* No. 96–2119, 1997 WL 161942, at *16 (D.Kan. Mar.21, 1997); *Anspach v. Tomkins Indus., Inc.,* 817 F.Supp. 1499, 1507 (D.Kan.1993), *aff'd,* 51 F.3d 285 (10th Cir.1995).

▇▇ The few cases in which courts have permitted outrage claims to survive summary judgment motions have involved repeated physical threats and racially or sexually abusive language. *See, e.g., Laughinghouse,* 754 F.Supp. at 836; *Gomez v. Hug,* 7 Kan.App.2d 603, 645 P.2d 916 (1982). In *Laughinghouse,* the plaintiff was the victim of sexual harassment and abuse from her supervisor described as "a concerted effort to terrorize her and to intentionally break her spirit." 754 F.Supp. at 843. Such harassment and abuse took the forms of screaming, cursing, sexual comments and unwanted touching, fits of rage, which included tearing up files and throwing things, threats of termination, and other tactics. *Id.* Evidence in that case indicated that the defendant mounted a concerted effort to terrorize the plaintiff and to treat her "like an animal." *Id.* Similarly, the defendant in *Gomez* subjected the plaintiff to vulgar, racist expressions, and threats of violence resulting in potentially serious medical problems. 645 P.2d at 918.

5 F.Supp.2d 936, 953–54.

Although cognizant of the overwhelmingly high standard the Kansas courts have set for IIED plaintiffs, the court finds that reasonable fact finders might differ as to whether Mr. Maier's conduct was so extreme and outrageous as to permit recovery. In particular, threatening to rape a women is not the kind of statement the court is prepared to equate with "mere insults, indignities, threats, annoyances, petty expressions, or trivialities." *Dotson v. McLaughlin,* 216 Kan. 201, 531 P.2d 1, 8 (1975). This is not the type of language members of society should ever become "hardened to." *Id.* Additionally, the court finds that a reasonable person, upon hearing Mr. Maier's threat, could spontaneously exclaim, "Outrageous!" *See id.*

The second threshold question is whether and to what extent Ms. Ratts suffered emotional distress as the result of Mr. Maier's conduct. Plaintiffs have the burden of demonstrating that Ms. Ratts' "distress was sufficiently severe, genuine and extreme that no reasonable person should be expected to endure it." *Land v. Midwest Office Tech., Inc.,* 114 F.Supp.2d 1121, 1145 (D.Kan.2000) (citing *Roberts v. Saylor,* 230 Kan. 289, 637 P.2d 1175, 1179 (1981)). Although the "emotional distress" may be classified as everything from nervous shock to mental anguish, the linchpin is whether the feelings of fright, shame, embarrassment, anger, disappointment, or worry were severe. *See Roberts,* 637 P.2d at 1179. Courts have looked to whether the plaintiff needed mental counseling as an indicator of the distress's severity. *See Land,* 114 F.Supp.2d at 1145 ("plaintiff has

presented evidence of her psychological evaluation ..."); *Price v. Automotive Controls Corp.,* No. 90–1193, 1992 WL 190680, at *8 (D.Kan. July 15, 1992) ("Her feelings of depression and anxiety were so severe that she required mental health counseling.").

In the present case, plaintiffs have presented evidence that Ms. Ratts underwent mental health counseling. (Pls.' Ex. 23 and 24). In particular, the evidence indicates that in early 1996, Ms. Ratts was suffering from major depression and general anxiety. She indicated to her mental health professionals that her relationship with Mr. Maier was the chief "stressor" causing her mental instability. The court notes that this "peak" in emotional distress corresponds in proximity to Mr. Maier's statement of intent to rape Ms. Ratts. The court is convinced that Ms. Ratts suffered more than mere humiliation or isolated feelings of embarrassment. This issue is best left in the hands of a jury, so the court will deny summary judgment on this claim.

■ Plaintiffs also bring an IIED claim on behalf of Mr. Ratts against defendants. However, plaintiffs' memorandum in opposition is limited to the following in regards to this claim: "For the same reasons, the Court should also find that J.D. Ratts suffered intentional infliction of emotional distress." (Pls.' Mem. at 72). At best, plaintiffs appear to be asserting some kind of derivative claim. At worst, plaintiffs are pursuing a meritless claim with full knowledge of the claim's legal insufficiencies. In any event, to be viable, an IIED plaintiff must have personally been subjected to outrageous conduct. For this reason, summary judgment is appropriate as to Mr. Ratts' claim.

● **False Light/Invasion of Privacy**

■ Kansas recognizes the general tort of invasion of privacy. *See Rinsley v.*

*Frydman,* 221 Kan. 297, 559 P.2d 334, 339 (1977). "Invasion of privacy," however, is merely an umbrella term for four distinct torts: (1) intrusion upon seclusion; (2) appropriation of name or likeness; (3) publicity given to private life; and (4) publicity placing a person in false light. *See id.* (citing Restatement (Second) of Torts § 652E (Tentative Draft No. 13)). Although plaintiffs' papers mention all four torts in passing, plaintiffs only make factual allegations concerning the fourth tort, publicity placing a person in false light. (Pls.' Mem. at 72). The tort of false light has three elements: (1) publication of some kind to a third party; (2) the publication must be false; and (3) the representation must be highly offensive to a reasonable person. *See Rinsley v. Brandt,* 700 F.2d 1304, 1307 (10th Cir.1983) (applying Kansas law); *Dow v. Terramara, Inc.,* No. 90–1412, 1992 WL 403093, at *8 (D.Kan. Dec. 4, 1992). Plaintiffs assert "Maier's sexual harassment and false statements regarding is [sic] relationship with Cindy Ratts constitute as to both plaintiffs an invasion of privacy and puts them in a false light. The other defendants' retaliation ... also put plaintiffs in a false light through their retaliatory actions." (Pls.' Mem. at 73). All defendants argue for summary judgment.

As for Mr. Ratts' claim, the City directs the court to Mr. Ratts' own deposition testimony, which states:

Question: How about invasion of privacy?

Answer: Oh, definitely invasion of privacy.

Question: In what regard?

Answer: Oh, probably nothing I can totally prove, just you know, everybody swarming to make your business their business. We also had suspicion of the

phone being tapped at our prior residence, which I wish we could get some kind of court order to go through the phone and find out if that's the case. Basically in that regard invasion of privacy.

Question: So those are things that you don't have any proof of any of these defendants doing?

Answer: That's correct.

(J.D. Ratts Dep. at 133). In light of this admission that no evidence supports his claim and plaintiffs' failure to properly plead any of the three above listed elements, the court grants summary judgment to all defendants on Mr. Ratts' claim.

▮▮ As for Ms. Ratts' claim, defendants argue plaintiffs have failed to demonstrate any publication to a third party concerning Ms. Ratts. Surprisingly, plaintiffs do not controvert the fact that it was Ms. Ratts herself who contacted a reporter at the *Newton Kansan* newspaper regarding her claims of sexual harassment. Nor do plaintiffs controvert the fact that Newton City Attorney, Bob Myers, declined to comment on internal personnel issues when asked for information regarding Ms. Ratts' allegations or provide the reporter with a copy of plaintiffs' complaint. Plaintiffs have utterly failed to properly demonstrate all three required elements of their claim. In fact, plaintiffs entire argumentation on this claim is merely a quoted passage from the Pretrial Order (Doc. 213). For these reasons, the court grants summary judgment to all defendants as to Ms. Ratts' claim.

## • Loss of Consortium

Plaintiffs assert claims for loss of consortium against all defendants. A loss of consortium claim is strictly a statutory creation. The Kansas statute authorizing such claims states: "Where, through the wrong of an other, a married person shall sustain personal injuries causing the loss or impairment of his or her ability to perform services, the right of action to recover damages for such loss or impairment shall vest solely in such person...." Kan. Stat. Ann. § 23–205. Therefore, although the damage award is for the benefit of the non-injured spouse, the claim vests in the spouse who actually brings the personal injury action. *See McGuire v. Sifers*, 235 Kan. 368, 681 P.2d 1025, 1038 (1984).

▮▮ Because plaintiffs bring loss of consortium claims for both Mr. and Ms. Ratts, both plaintiffs must also have a viable personal injury claim. It is unsettled whether a Kansas plaintiff need suffer a physical injury in order to satisfy the statute's "personal injury" language. *Compare Ulrich v. K–Mart Corp.*, 858 F.Supp. 1087, 1095 (D.Kan.1994) (dismissing a loss of consortium claim), *aff'd*, 70 F.3d 1282 (10th Cir.1995) (table), *with Roberts v. Air Capitol Plating, Inc.*, No. 95–1348, 1996 WL 563830, at *3 (D.Kan. Sept.27, 1996) (allowing a loss of consortium claim where no physical injury was present but the plaintiff presented an IIED claim) (Marten, J.). Upon review, the court agrees with the rationale espoused by Judge Marten in *Roberts* and also believes a Kansas court would allow a loss of consortium claim supported by an emotional distress injury.

▮▮ As for Mr. Ratts' claim, having granted summary judgment on Mr. Ratts' underlying IIED claim, the court must grant summary judgment on this claim. Without a viable personal injury claim, a derivative loss of consortium claim has no place before a jury. *See Wood v. City of Topeka*, 90 F.Supp.2d 1173, 1196 (D.Kan. 2000). Therefore, the court will grant summary judgment on Mr. Ratts' claim as to all defendants.

As for Ms. Ratts' claim, because the court granted summary judgment to all defendants except Mr. Maier on Ms. Ratts' IIED claim, the court will grant summary judgment to all defendants except Mr. Maier on Ms. Ratts' loss of consortium claim. Mr. Maier's only argument for granting summary judgment on this claim involves the physical versus emotional "personal injury" issue. Having decided the matter against Mr. Maier, the court sees no surviving justification for granting summary judgment. Therefore, Mr. Maier's motion for summary judgment is denied as to this claim.

## • Breach of Confidentiality

A breach of confidentiality claim originally appeared in the Pretrial Order (Doc. 213), however, plaintiffs assert in their memorandum in opposition that they now wish to incorporate this claim into their invasion of privacy claim. Plaintiffs offer no explanation, authority, or argumentation regarding this claim. Considering the court's ruling regarding plaintiffs' invasion of privacy claim, the court is compelled to grant summary judgment on this claim as to all defendants. In the alternative, the court considers this claim abandoned by plaintiffs.

## • Negligence

A negligent supervision claim was originally asserted by plaintiffs against the City and County. The City asserts such a claim is disfavored by Kansas courts in the employment discrimination context. (Defs.' Mem. at 67). Plaintiffs' papers are completely devoid of any mention of this claim. The court is convinced that such inaction constitutes abandonment by plaintiffs. Therefore, the court will grant summary judgment on this claim as to both the City and County.

## • CONCLUSION

The court has undertaken to examine each of plaintiffs' claims. The following is a summation of the court's rulings on defendants' motions for summary judgment.

## • Federal Claims

Plaintiffs brought three Title VII claims: sexual harassment, gender discrimination, and retaliation. As for plaintiffs' sexual harassment claims, summary judgment is granted to both the City and County on the quid pro quo claim. Summary judgment is granted for the County on plaintiffs' hostile work environment claim but denied as to the City. Summary judgment is granted as to both the City and County on plaintiffs' gender discrimination claim. Finally, summary judgment is granted for plaintiffs' retaliation claim as to the County but is denied as to the City.

Plaintiffs brought multiple sub-claims within their § 1983 claim. Summary judgment is granted on all of plaintiffs' claims as to all defendants.

As for plaintiffs' ADA claim, summary judgment is granted to both the City and County.

## • State Claims

As for plaintiffs' KAAD claims, summary judgment is granted as to all defendants.

As for plaintiffs' conspiracy to interfere with livelihood claim, summary judgment is granted to all defendants.

Both plaintiffs brought IIED claims. As for Mr. Ratts' IIED claim, summary judgment is granted as to all defendants. As for Ms. Ratts' IIED claim, summary judgment is granted to all defendants except Mr. Maier.

Both plaintiffs brought invasion of privacy claims. Summary judgment is granted to all defendants as to both claims.

Both plaintiffs brought loss of consortium claims. As for Mr. Ratts' claim, summary judgment is granted as to all defendants. As for Ms. Ratts' claim, summary judgment is granted to all defendants except Mr. Maier.

Finally, as to plaintiffs' breach of confidentiality and negligence claims, summary judgment is granted on both claims as to all defendants.

In sum, only Ms. Ratts' Title VII hostile work environment and retaliation claims against the City and Ms. Ratts' IIED and loss of consortium claims against Mr. Maier have survived summary judgment.

**IT IS THEREFORE BY THIS COURT ORDERED** that defendants Board of County Commissioners, Harvey County Kansas, City of Newton, Kansas, Robert Myers, Donald Horst, James Heinicke, and Ron Ahsmuhs' Motion for Summary Judgment (Doc. 221) is granted in part and denied in part. The motion is denied as to Ms. Ratts' Title VII sexual harassment and retaliation claims only as against defendant City of Newton, Kansas. Defendants' motion is granted in all other respects.

Defendant Robert Maier's Motion for Summary Judgment (Doc. 218) is granted in part and denied in part. The motion is denied as to Ms. Ratts' intentional infliction of emotional distress and loss of consortium claims. Defendant's motion is granted in all other respects.

**IT IS FURTHER BY THIS COURT ORDERED** that this Memorandum and Order shall be filed under seal. The parties have until **April 18, 2001 at 5:00 p.m.** to show cause as to why the court should not unseal this Memorandum and Order.